# In the United States Court of Federal Claims

**No. 20-541C**
**Filed: September 4, 2020**
**Redacted Version Issued for Publication: September 18, 2020[1]**

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * | * |
| | * |
| **HVF WEST, LLC,** | * |
| | * |
| Protestor, | * |
| | * |
| v. | * |
| | * |
| **UNITED STATES,** | * **Post-Award Bid Protest; Mixed-** |
| | * **Transaction Contract; Subject-Matter** |
| Defendant, | * **Jurisdiction; Standing; Cross-** |
| | * **Motions for Judgment on the** |
| v. | * **Administrative Record.** |
| | * |
| **LAMB DEPOLLUTION, INC.,** | * |
| | * |
| | * |
| Defendant-Intervenor. | * |
| | * |
| * * * * * * * * * * * * * * * * * * * | * |

E. **Sanderson Hoe**, Covington & Burling LLP, Washington, D.C., for protestor. With him were **Thomas Brugato**, **Andrew R. Guy**, and **Darby J. Rourick**, also of Covington & Burling LLP, Washington D.C.

**Ioana Cristei**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her were **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Ethan P. Davis**, Acting Assistant Attorney General, Civil Division. Of counsel was **Gregory J. Gusching**, Attorney Advisor, Defense Logistics Agency, Battle Creek, MI.

**Shar Bahmani**, Sacks Tierney P.A., Scottsdale, AZ, for defendant-intervenor.

---

[1] This Opinion was issued under seal on September 4, 2020. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued with the redactions that the parties proposed in response to the court's request and one addition for consistency. Words which are redacted are reflected with the notation: "[redacted]."

**O P I N I O N**

The post-award bid protest at issue in the above-captioned bid protest filed by protestor, HVF West, LLC (HVF) arises out of the award of a bridge contract issued by the Defense Logistics Agency, Disposition Services (DLA DS) of the Department of Defense, for the removal, demilitarization, mutilation and sale of government "scrap" awarded to defendant-intervenor, Lamb Depollution, Inc. (Lamb). HVF responded with the highest price offer to purchase the government property to be removed from government facilities, and subsequently demilitarized or mutilated prior to being disposed of by the contractor, pursuant to the bridge contract No. A0008025 (the Solicitation). After HVF was found to be "non-responsible," the contract was awarded to the defendant-intervenor, Lamb, which submitted the second highest price offer. Protestor argues that in finding it non-responsible, and then awarding the bridge contract to Lamb, DLA DS acted arbitrarily and capriciously, and seeks to permanently enjoin the award. The parties cross-moved for judgment on the administrative record. Defendant and defendant-intervenor also filed motions to dismiss, arguing that this court's bid protest jurisdiction, pursuant to 28 U.S.C. § 1491(b)(1) (2018), does not provide subject-matter jurisdiction to hear protestor's bid protest because the bridge contract at issue is one for the sale of government property, and that protestor lacks standing to challenge the award to Lamb.

By way of background, the Solicitation at issue in the case currently before the undersigned was preceded by a previous award of a solicitation by DLA DS, pursuant to Solicitation No. A0007598 (the '598 Contract), which also concerned the removal, demilitarization, mutilation, and sale of government property. The '598 Contract, also was awarded to Lamb, and the award also was protested by HVF in the United States Court of Federal Claims. See HVF West, LLC v. United States, Case No. 19-1308C. On November 22, 2019, Chief Judge Sweeney found in favor of HVF on the protest of the '598 Contract, finding that the Sales Contracting Officer (SCO) for DLA DS had "acted irrationally by not following the evaluation process set forth in the solicitation" when evaluating Lamb for award, and that HVF was prejudiced by the SCO's actions. See HVF West, LLC v. United States, 146 Fed. Cl. 314, 334–39 (2019) (HVF West I), recons. denied, 16 Fed. Cl. 451 (2020), appeal docketed, No. 20-1414 (Fed. Cir. Jan. 30, 2020). Chief Judge Sweeney also found that the United States Court of Federal Claims had "subject-matter jurisdiction over HVF's protest because the resulting contract from the solicitation at issue [the '598 Contract] was for a mixed transaction—the awardee would be buying property from the government while also providing a non-de minimis service to the government." See id. at 328–29. Chief Judge Sweeney also found that HVF had "demonstrated a direct economic interest in the DLA's award of the contract," and, therefore, HVF had standing to challenge the previous award to Lamb. See id. at 329–31. Chief Judge Sweeney ultimately granted HVF's request for injunctive relief, stating that

the appropriate remedy is for the SCO to either (1) cancel its contract with Lamb and determine a new awardee under the existing solicitation, or (2) cancel its contract with Lamb and rebid the procurement under a new

solicitation. The DLA must choose one of those options to cure the errors noted above.

HVF West I, 146 at 341. Subsequent to Chief Judge Sweeney's decision in HVF West I, DLA DS did not cancel the '598 Contract awarded to Lamb, but issued a stop-work order on the '598 Contract. On December 9, 2019, DLA DS issued the interim Solicitation in the current protest, No. A0008025, as a bridge contract in anticipation of an appeal of Chief Judge Sweeney's decision to the United States Court of Appeals for the Federal Circuit, which appeal was filed on January 30, 2020.[2] After DLA DS awarded the bridge contract to Lamb, HVF brought the above-captioned bid protest of the award of the bridge contract in this court.[3]

## FINDINGS OF FACT

Solicitation No. A0008025, the solicitation of the bridge contract at issue in the above-captioned protest, No. 20-541C, stated that the "Invitation for Bid (IFB) is for a firm fixed price sales contract where the bid price is expressed in United States dollars/cents per pound," and that "[t]his is a sales contract for the sale of scrap pursuant to provision in Title 40, US Code, Chapter 5 wherein the Purchaser is agreeing to conduct Demilitarization and mutilation of the property as a condition of sale." (capitalization in original). The Solicitation further stated that DLA DS "expects the Purchaser to perform all requirements under this sales contract at the bid price provided by the Purchaser," and that "[t]he Agency guarantees to issue the total combined estimated annual generation of DEMIL/MUT [Demilitarized/Mutilated] property offered in the amount of 19,000,000 lbs. for sale within the terms of the Adjustment for Variation in Quantity or Weight clause (Sale by Reference (SBR) Part 4, Condition 5)." (capitalization in original).

The Solicitation defined "Demilitarize (DEMIL)" as:

The act of eliminating the functional capabilities and inherent military design features from DOD personal property. Methods and degree range from removal and destruction of critical features to total destruction by cutting, crushing, shredding, melting, burning, etc. DEMIL is required to prevent property from being used for its originally intended purpose and to prevent the release of inherent design information that could be used against the

---

[2] The court notes that Case Number 20-1414 before the United States Court of Appeals for the Federal Circuit refers to the appeal that Lamb filed. Subsequently, defendant filed an appeal with the Federal Circuit, Case No. 20-1583. The Federal Circuit has consolidated the appeals, and is considering the appeals together. See Order, HVF West, LLC v. United States, Case No. 20-1583 (Fed. Cir. March 24, 2020).

[3] The parties were orally informed that defendant's motion to dismiss for lack of subject-matter jurisdiction was dismissed. The parties requested the court to incorporate that decision in writing in this Opinion. The following Opinion addresses in writing the defendant's motions to dismiss for lack of subject-matter jurisdiction and standing, as well as DLA DS' finding by the defendant of non-responsibility on the part of HVF.

United States. DEMIL applies to DOD personal property in both serviceable and unserviceable condition.

(capitalization in original). "Mutilation (Scrap Classification (SCL) MUT)" is defined as a "process that renders material unfit for its originally intended purposes by cutting, tearing, scratching, crushing, breaking, punching, shearing, burning, neutralizing, etc. Required to have Certificate of DEMIL or MUT signed by certifier and verifier." (capitalization in original).

The scrap material at issue in the Solicitation, also referred to as "property stream," "may consist of, but is not limited to":

> [A]luminum and steel scrap (light and heavy), copper, brass with nonmetallic material to include plastic and textile, fiberglass, Kevlar and body armor, satellite antennas, large weapon system and parts, wheeled and tracked vehicles (lead acid batteries may be included), tank track, trailers, containers, aircraft and aircraft components that are flight safety critical aircraft parts (FSCAP) and sensitive components and textiles requiring demilitarization and/or mutilation. This property consists of DEMIL codes B, C, D[,] E, F and Q. Purchaser may also receive approved DEMIL G property with Material Documented as Safe (MDAS) certificate and DEMIL P property with declassification certificate.

(capitalization in original).

The Solicitation also explained that

> [t]his sale is being offered as a bridge sale due to pending litigation involving a previous award on Solicitation No. A0007598. If an appeal is taken in the pending litigation the Agency does not expect it to be resolved for at least 12 month [sic]. Accordingly, the performance period of the sales contract resulting from this IFB shall be limited to a 12-month base period, followed by two 12-month option periods that may be exercised at the Sales Contracting Officer's (SCO) discretion. The sales contract also contains an available six-month extension period that may be offered at the SCO's discretion at the end of each performance period, under the same terms and conditions of the sales contract. In the event the extension is utilized, the SCO shall advise the contractor in writing 30 calendar days prior to the expiration of the current period of performance period [sic]. The extension may be utilized in 30-day increments, a combination of 30-day increments, or in its entirety. The entire length of the sales contract, if all option periods and extension are used, shall not exceed three years.

(capitalization in original).

Section 3 of the Solicitation, titled: "General Terms and Conditions" stated:

This is not a service contract administered in accordance with the Federal Acquisition Regulations (FAR). This is a sales contract for the sale of scrap pursuant to provision [sic] in Title 40, US Code, Chapter 5 wherein the Purchaser is agreeing to conduct Demilitarization and mutilation of the property as a condition of sale. The Government is not responsible for any indirect or inconsequential expenses related to performance under this sales contract. The measure of the Government's liability, in any case where liability of the Government to the Purchaser has been established, shall not exceed refund of such portion of the purchase price as the Government may have received. Purchaser may be required to attend special training, seminars, instructions, classes, safety orientations, etc., provided by the Government or to provide information to perform work or gain access to the site. Example: Pass and ID requirements, antiterrorist training, Environmental Management Systems (EMS) policies and/or equipment training.

(capitalization in original).

The Solicitation at issue in the above-captioned protest required that the "Purchaser's facility must be located within 50 miles of DLA Disposition Services Tucson, Arizona Centralized DEMIL Division (CDD)," and that "[b]idders must be able to receive up to 40 direct shipments per week in addition to the 25 loads per week the bidder must remove from Tucson CDD and at RIP [Receipt in Place] locations on and around Davis Monthan AFB [Air Force Base]." (capitalization in original).  The Solicitation further stated that the Purchaser

is expected to DEMIL/MUT and remove a minimum of 1,585,000 pounds per month. Weight is tracked and billed by weight tickets and DLA Form 1367 for outbound scrap removed from the site. The Purchaser is responsible for removal and disposal of all scrap, to include all metallic and non-metallic material resulting from the DEMIL/MUT process at no cost to the Agency.

(capitalization in original). The Solicitation also required that "[a]ll DEMIL/MUT operations will be conducted off Government premises" (capitalization in original), with the exception of "downsizing," which is the limited destruction of government property which occurs on government premises, but which "is authorized only to the extent for property to be properly and safely transported." The Purchaser is "required to clean-up the workspace, remove, and dispose of any parts or debris resulting from the Purchaser[']s performance/downsizing at the end of each work day." (capitalization in original).

The Solicitation at Section 2, Subsection 1, titled: "Demilitarization/Mutilation Section," provided further requirements for the removal, demilitarization and mutilation of the scrap at issue, including that the "Apparent High Bidder" "must complete training and

submit an appointment letter with the certifiers name and signature on it to the SCO before work can begin." (capitalization in original). Furthermore, "[a]gency verifier(s) must be present for all DEMIL/MUT operations. If the Agency verifier is unavailable for any reason, operations are to be shut down until the verifiers return." (capitalization in original). The Solicitation in the above-referenced Subsection also reiterated that the Purchaser was "required to move all property located on DLA Disposition Services Tucson CDD [Centralized DEMIL Division] and at RIP [Receipt in Place] locations on and around Davis Monthan AFB [Air Force Base]," and that the Purchaser is "required to DEMIL/MUT all property streams." (capitalization in original). The Solicitation further stated that "[a]ll military markings and data plates are to be completely destroyed during the DEMIL/MUT process." (capitalization in original). The "[m]ethod and degree of demilitarization will be IAW [in accordance with] DODM 4160.28 Vol 3," and the "appointed Agency Verifier will have final say in the DEMIL/MUT of property." (capitalization in original). Notably, the Solicitation in the above-referenced Subsection stated that title to the scrap does not pass to the Purchaser until "the DEMIL or Mutilation has been completed and the Certificate of DEMIL or Mutilation has been signed by both the Purchaser certifier and the Agency verifier and the [Form] 1367s is [sic] signed by both the Purchaser certifier and the Agency verifier." (capitalization in original).

The Solicitation contained an "Environmental and Human Safety Notice," which stated:

> It is the responsibility of the Purchaser to ensure that the ultimate end use of the property is performed in an environmentally compliant manner. As such, prior to the award of any hazardous item, each high bidder's premises and/or the intended disposal facility may be subject to an on-site inspection by a Government representative. All offerors are advised that they must comply with all applicable Federal, State and local laws, ordinances, regulations, etc. with respect to human safety and the environment during the processing, use, or disposal of material purchased from the Department of Defense.

(capitalization in original).

Regarding "Bid Evaluation and Award," the Solicitation stated:

> a. This is not a service contract awarded or administered in accordance with the Federal Acquisition Regulations (FAR). This is a sales contract for the sale of scrap that will be awarded and administered pursuant to the provisions in Title 40, US Code, Chapter 5.

> b. The Government intends that a single award will be made to a responsible bidder with the highest priced responsive bid, unless a determination is made to reject the bid under 41 CFR § 102-38.205.

c. Under 41 CFR § 102-38.205, the Agency reserves the right to accept or reject any or all bids. The Agency may reject any or all bids when such action is advantageous to the Government, or when it is in the public interest to do so.

d. A responsive bid is a bid that complies with the terms and conditions of the sales offering, and satisfies the requirements as to the method and timeliness of the submission. Only responsive bids may be considered for award.

e. The general standards in FAR Part 9 on contractor responsibility determinations that are applicable to procurement contracts are not directly applicable to sales contracts awarded under 40 U.S. Code § 545, but may be considered by the Sales Contracting Officer in evaluating bidder responsibility.

f. A responsible bidder is one that has the necessary organization, experience, financial resources, accounting process, operation controls, technical equipment and facilities, or the ability to obtain them, to perform the requirements of the sales contract, and has no disqualifying factors (i.e., is not suspended, debarred or an ineligible transferee).

g. Prior to award, the Agency will conduct a pre-award survey of the apparent high bidder. Only the high bidder will be evaluated through this screening process and there will be no comparative analysis done on other bidders. At a minimum, an apparent bidder must submit an End Use Certificate (EUC), DLA Form 1822, and Statement of Intent (SOI) DLA Form 2536. The apparent high bidder shall be required to provide detailed information on every storage location the apparent high bidder intends to use. The pre-award survey may be conducted at the apparent high bidder's facility(ies) or other location(s) as deemed necessary by the Agency and may include but is not limited to a review of a the [sic] apparent high bidder's facilities and equipment, financial capability or disclosure of the apparent high bidder's financial condition, quality assurance, safety, environmental responsibility and transportation. The apparent high bidders shall cooperate in the pre-award vetting process by assisting in arrangements and/or by providing requested information in a timely manner. The apparent high bidder is advised that accomplishment of a pre-award survey or furnishing documents to the Agency in support of the pre-award survey is part of the assessment of the bidder's responsibility and is not a guarantee the bidder will receive award of a contract. The SCO may rely upon information obtained in the pre-award survey in making his assessment of the bidder's present responsibility.

(capitalization in original). The Solicitation further stated that the pre-award survey will include, but is not limited to: the passing of "an inspection by Agency personnel prior to

contact [sic] award"; an "Environmental Responsibility Determination (ERD)" conducted by DLA DS personnel; a "Trade Security Control Assessment" conducted by DLA DS personnel; and a review of "[n]ecessary licenses, permits and certifications." If the SCO determined that the apparent high bidder

> cannot be found affirmatively responsible, the next highest bidder will be assessed in the same pre-award survey process. This same process of vetting the next highest responsive bidder may continue, at the sole discretion of the Sales Contracting Officer, until a responsive bidder is identified and is determined to be affirmatively responsible.

Once the apparent high bidder was notified that it was the apparent high bidder, it had three working days to:

> a. Complete and return End Use Certificate (EUC), DLA Form 1822 to the SCO. (SCO will provide these forms at notification);
>
> b. Complete and return Statement of Intent (SOI), DLA Form 2536 to the SCO. (SCO will provide these forms at notification); [and]
>
> c. Provide DEMIL/MUT certifier appointment letters to the SCO.

(capitalization in original).

On December 30, 2019, DLA DS announced that pursuant to Solicitation No. A0008025, five companies had submitted bids, including HVF and Lamb. HVF was the apparent high bidder, offering $[redacted] per pound. Lamb's offer was second highest, at $[redacted] per pound.

In HVF's SOI, HVF stated that it intended to sell the "materials recovered from DEMIL and metals processing." (capitalization in original). HVF's End-Use Certificate also stated:

> Following verification and certification that DEMIL/Mutilation has been fully completed pursuant to DoD regulations and Solicitation 8025 requirements to the condition of scrap as defined in both said regulations and the Solicitation, it is anticipated that the resultant scrap will be sold and used by the purchaser as feed charge material to furnaces and melted, with the molten metal then used in the manufacture of products.

(capitalization in original). The site where HVF intended to conduct the demilitarization and mutilation of government property is located in Tucson, Arizona, and shares part of its perimeter fence with Davis Monthan Air Force Base (DMAFB), one of the locations from which the Solicitation provided for government scrap to be removed. HVF provided DLA DS with a statement of HVF's "Key Demilitarization/Mutilation Personnel," which provided the following names and information:

<u>Arizona</u>

[Redacted]
- Vice President
- 24 years of experience in operation/processing metallic/non-metallic materials and plant management. Primary overall management responsibility for Demil/Mut Operations.

[Redacted]
- Production Manager.
- 30 years experience in the U.S. Military: Army and Air Force
- 15 years experience in DLA in property disposal, Demil coordinator.
- 14 years experience in managing the processing of metallic/non-metallic materials; oversight of Demil/Mut deliveries and operations.

[Redacted]
- Production and Maintenance Manager.
- Responsible for operation and maintenance of metallic processing/demil/mut equipment.
- 14 years of experience in processing metallic/non-metallic materials.

[Redacted]
- Production and Sales Manger
- 16 years of experience in processing metallic/non-metallic materials.

[Redacted]
- Manager of Environmental compliance
- Safety and environmental training
- Operations and maintenance equipment
- 11 years of experience.

[Redacted]
- Office Manager
- 4 years of experience in processing metallic/non-metallic materials.

On site operators, welders, drivers, and security.

<u>Michigan</u>

[Redacted]
- President
- 50 years of experience in operation/processing metallic/non-metallic materials.

[Redacted]
- Executive Vice President
- 50 years of experience in operation/processing metallic/non-metallic materials.

[Redacted]
- Senior Vice President
- 25 years of experience in operation/processing metallic/non-metallic materials.

[Redacted]
- Senior Vice President/General Counsel
- 35 years of experience of addressing legal matters in the metals processing industry including agreements and contracts with agencies of the US Government.

[Redacted]
- Vice President Environmental Affairs
- 40 years of experience of addressing environmental compliance matters in the metals processing industry.

[Redacted]
- Associate General Counsel
- 8 years of experience of addressing legal matters in the metals processing industry including agreements and contracts with agencies of the US Government.

[Redacted]
- Environmental Manager
- 32 years of experience addressing environmental compliance matters.

Full accounting department led by CPAs

(capitalization and emphasis in original).

On January 14, 2020, members of DLA DS conducted an initial inspection of HVF's facility. The DLA DS members present during the January 14, 2020 inspection included David Powell, Phillip Groll, and Forrist Richardson. Also on January 14, 2020, Mr. Groll completed a pre-award survey on DLA Form 2537 (the January 14, 2020 Form 2537). The January 14, 2020 Form 2537 stated that the most recent regulatory inspection by the Arizona Department of Environmental Quality (ADEQ) Pima County of the HVF site was conducted on May 28, 2014. The January 14, 2020 Form 2537 described the result of the May 28, 2014 inspection as follows:

Upon review of the records and inspection results, it was determined the [sic] HVF is not currently a generator of hazardous waste and that no potential Resource Conservation and Recovery Act (RCRA) violations related to this compliance inspection were observed at the time of inspection on May 28, 2014. The inspection determined the facility to be in substantial compliance with the requirements of 40 CFR of the Code of Federal Regulations, A.R.S., A.A.C., and applicable permit/license requirements under Title 7 of Pima County Code.

(capitalization in original). The January 14, 2020 Form 2537 did not indicate any concerns regarding HVF's environmental responsibility, and gave HVF a "RESPONSIBLE" environmental assessment, further stating that HVF "has processes in place to maintain environmental responsibilities and has Emergency Response Plans and Training." (capitalization in original). The January 14, 2020 Form 2537 also answered the question of whether there was "evidence of property being stored longer than 1 year," in the negative.

The administrative record in the above-captioned protest also contains an "Offsite Recycling/Demilitarization Facility Inspection Form" (capitalization omitted), completed by David Powell and Forrist Richardson on January 15, 2020, after their January 14, 2020 inspection by DLA DS. The inspection form provided the following comments:

- Visual observation: GOV Demil Scrap material still on site since last contract ended in Dec 2018
-- Several piles of material were observed on site. Can't determine if its [sic] storage or pending removal. Site Contractor leadership indicated/stated removal will be completed by 2 Feb 2020

- Over 500 Tires observed on site.
-- Recommend permit determination for waste tires/used tires.

- Perimeter fence required on east side of HVF compound. Can't use Davis Monthan AFB perimeter fence as their perimeter fence. Required a 5ft "clear zone" between the perimeter fence. REF DOD 5100.76-M, Enclosure 9

- Noted/observed material (Tri-Wall lids) stacked next to fence (Southwest end of compound), over ft high [sic], obstructing visual observation and potential breach. Required 5 ft clear zone.

- Noted several areas on south and west perimeter fence with brush/weeds over the top or through perimeter fence that requires removal.

(capitalization in original).

Also on January 14, 2020, William Elson, Senior Vice Present and General Counsel of HVF, wrote the following email to Todd Koleski, the Sales Contracting Officer for DLA DS assigned to the bridge contract currently at issue:

Mr. Koleski:

The visit by Mr. Dave Powell and his team of HVF West's Tucson facility was conducted today. We would appreciate your forwarding Mr. Powell's report to you summarizing his team's visit and the completed Offsite Recycling/Demilitarization Facility Inspection Form. During and after Mr. Powell completed his site visit, he was asked if he required any additional information to which he responded that he would review his notes and the notes of his team and let us know. Mr. Powell was shown the area where Demil/Mut work was to be performed including the current concrete pad in that area. We advised Mr. Powell that two miscellaneous scrap material piles located in that area would be moved. We also advised Mr. Powell of our intention to lay crushed asphalt in front of the concrete pad. Mr. Powell requested that demarcation implements be placed to show that the Demil/Mut area was separated from the rest of our plant. Mr. Powell indicted [sic] that he was looking to make a second visit to the site not later than the end of January to confirm that the Demil/Mut site area was then ready for receipt of government material.

In addressing the question on the Offsite Recycling/Demilitarization Facility Inspection Form regarding the date of the most recent regulatory inspection we, [sic] advised Mr. Groll that as best we could recollect, Pima County had visited our site about three years ago but that we would review our files and get back with him. In fact, the most recent regulatory inspection of our site was conducted almost 6 years ago by Pima County. The County confirmed in its letter of June 11, 2014, copy attached, that HVF was not a generator of hazardous waste and that no RECRA [Resource Conservation and Recovery Act] violations were observed. Our Joe Stead will forward the June 11 2014 letter on to Mr. Groll.

In connection with your review of HVF West's ("West") responsibility under the referenced solicitation attached are the following.

1. West's Operational Plan describing among other matters, its operational controls, quality assurance, safety, environmental responsibility, transportation capabilities, technical equipment and facilities and accounting processes.

2. Identification of key personnel at West providing a brief description of their responsibilities and experience in demilitarization and mutilation and in the processing of metallic and non-metallic materials.

3. Copies of the various permits issued for our facility.

4. A letter to you summarizing West's financial condition and resources.

The material in number 1, 2, and 3 above, were as well delivered to Mr. Powell today and we had advised him that we would be forwarding these materials on to you. Item 4 above was not delivered to Mr. Powell. We request that the letter and attachments regarding West's financial condition and resources remain with you and your superiors in Battle Creek and such other personnel at DLA Disposition Services in Battle Creek who are required to review the financial information in assisting your consideration during the pre-award survey.

We request that should you require any additional information following your review of the enclosed materials and the report provided to you by Mr. Powell, please so advise by e-mail. We will respond to requests for additional information promptly.

(capitalization in original).

On January 15, 2020, ADEQ performed an unannounced inspection of the HVF site in response to an anonymous complaint submitted to ADEQ. The inspection consisted of two parts: a hazardous waste inspection, and a solid waste inspection. Pursuant to the two-part inspection, ADEQ generated a Hazardous Waste Inspection Report and a Solid Waste Field Inspection Report, completed by ADEQ inspectors Jenna Brickner and Anthony Stone, respectively. HVF's on-site representative for both inspections was Scott Laughlin. The Hazardous Waste Inspection Report stated on the cover page that "Follow-up action is needed; please submit the requested documentation, which is detailed on the inspection report." In the Hazardous Waste Inspection Report, Jenna Brickner also checked the box next to: "Check this box if there is 'a risk to any person, the public health, safety or welfare or the environment' per ARS § 41-1009." The "Observation" section of the ADEQ Hazardous Waste Inspection Report stated:

The purpose of this inspection was respond [sic] to a complaint submitted to ADEQ. The agency's hazardous waste inspections unit co-inspected the facility with the solid waste unit.

During the inspection, ADEQ observed multiple piles of assorted military scrap metal. Some piles were placed on concrete and some piles were placed directly on soil. Military aircraft can be painted with a product that contains chromium and/or cadmium. ADEQ observed painted aircraft parts and paint chips throughout the property, on and off the paved areas.

ADEQ identified a pile of painted aircraft parts that appeared to contain more painted pieces than other piles. The paint is a lime green color which is distinctive of aircraft paint containing chromium and/or cadmium. When

the tractor scoops up the metal scrap for processing, it grinds the paint chips into a powder. The concrete slopes downward to soil to the south. At the time of the inspection, ADEQ observed that stormwater had collected in a surface depression of the soil located downgradient of the pile of painted aircraft pieces.

ADEQ retrieved samples in two locations at the facility. The first location was at the base of the pile mentioned above. The sample collected was of the powdered layer on the concrete. The second sample was from the top three inches of soil in the area between the concrete slab and collection of stormwater.

ADEQ sent the samples to a third party registered environmental lab for analysis [Eurofins TestAmerica]. The results for the sample located at the base of the pile, are 1100 mg/Kg for total chromium and 4.2 mg/L for cadmium by Toxicity Characteristic Leaching Procedure (TCLP). The results for the sample from the soil downgradient of the pile, are 480 mg/Kg for total chromium and 4.9mg/L for cadmium by TCLP. Sample analysis for TCLP regulatory levels is an approved procedure for determining an accurate waste determination pursuant to 40 CFR § 262.11 / A.A.C. R18-8-262.

The sample results indicate that the facility is storing and disposing hazardous waste without a permit. [sic] consequently disposing its hazardous waste directly into the environment. These actions are violations pursuant to A.A.C. R18-8-270(B)(1) and 40 CFR § 265.31 / A.A.C. R18-8-265.

(capitalization in original). The ADEQ Hazardous Waste Inspection Report also stated that "[p]ending the results of the sample analysis, ADEQ may require further documentation," and directed HVF "[g]oing forward, [to] manage, store, and dispose of waste fluorescent lamps as universal waste and [to] discontinue disposal at the city household hazardous waste center."

Like in ADEQ's Jenna Brickner's Hazardous Waste Inspection Report on HVF's site, the Solid Waste Field Inspection Report, completed by Anthony Stone of ADEQ, also stated that "Follow-up action is needed; please submit the requested documentation, which is detailed on the Notice of Opportunity to Correct." The following comments were provided in the Solid Waste Inspection Report:

On January 15, 2020, Solid Waste Inspections Unit (SWU), conducted a complaint based inspection of HVF West for compliance with Arizona's provisions for solid waste, used oil, waste tires, and lead acid batteries.

After the SWU identified itself and stated its purpose for the inspection, permission was granted by Scott Laughlin, Vice President Operations, to

inspect the property. The SWU documented its observations with a number of photographs. Refer to the enclosed ADEQ Photo-log.

Mr. Laughlin stated that HVF West is a metal recycling facility that is paid by the U.S. Military to shred military aircraft and other items. The shredded material is sorted to remove the ferrous and non-ferrous metals for recycling. According to Mr. Laughlin, the metal processing is conducted on an as-needed basis once the product arrives. Mr. Laughlin stated that he was not allowed to provide information about the specifics of the process, material being processed, when material was received, when material will be sent out, origin of the material, or where the material will be will be [sic] sent. However, he did state that 100 percent of the shredded piles are considered to be product and not a waste.

During the inspection, SWU observed that HVF West had not created sufficient measures to reduce the potential of soil contaminations from their recycling activities. Concrete had been installed on a large portion of the outdoor facility yard located around the processing building; however, the majority of the material on-site appeared to be sitting directly on bare soil.

The used oil storage building contained one larger container of used oil properly labeled with the words "used oil" and placed in functional secondary containment. All used oil is transported by Arizona Waste Oil Services. SWU did not observe used oil [or] contaminated soil during the inspection. No waste batteries were on-site at the time of inspection.

Damaged tires are cut into small pieces and disposed at Los Realis landfill. Whole tires are taken to the Pima County Waste Tire Collection site on Ina Road. They are later collected by CRM and taken to Mesa to be processed. Mr. Laughlin is currently working on an arrangement with CRM to directly transport them to Mesa and bypass the Ina Road location. SWU reviewed some waste tire manifests that demonstrated HVF West is currently removing tires from the site and they stated all the tires will be removed by the middle of February.

While aircraft tires are considered off-road tiers and the waste tire collection site regulations do not apply to them, HVF must still use best management practices to help with fire suppression. HVF should implement the same standards as a waste tire collection site, which includes but is not limited to fire extinguishers, "No Smoking" signs, and access routes. SWU gave Mr. Laughlin two compliance assistance posters which will help with tire determination, storage, and disposal.

Mr. Laughlin was informed that anything declared a waste (tires or waste generated from shredding activities) is not allowed to remain on the property

longer than ninety days or it considered [sic] improper disposal of solid waste.

(capitalization in original).

The administrative record indicates that David Powell and Forrist Richardson of DLA DS visited HVF's site again on January 23, 2020. In a January 24, 2020 internal DLA DS email to Sales Contracting Officer, Todd Koleski, with the subject: "HVF Site Visit 23 Jan 2020," David Powell of DLA DS wrote:

Todd,

Our visit with HVF's Scott Laughlin and staff was not what Forrist and I expected. Looking at Attachment 5 (A5) from HVF's original layout and given what we thought would be fixed (vegetation, piles of debris left of A5) was not cleared. In A5 there were laydown and overnight storage areas planned out. However, what we saw was a roped off-see Ruff Sketch (RS)- from ground level looked very narrow. I asked Scott if this is HVFs [sic] proposed area for DLA? He said yes. I asked him if he believed this area can handle 90 trucks per week laydown, breakdown and stage areas and send to hammer mill processing to include rolling stock and aircraft. His answer was a not so confidant, yes.

I brought [sic] the fence line on the Northside of HVF stating that fence is the border between DM and HVF. We told him about HVF using DM fence line as a border would not be possible because the outriggers at the top would face in towards HVF, they need to face outward [sic]. The email chain below has HVF asking the question.

We spoke about what needs to happen to the property after hours using the proposed DLA area all items need to go back into DLA's area overnight if not demiled/mutted [sic]. He was not opposed to it. Scott also mentioned they could move the vehicle drain stations into our area. I said looking at what you're proposing this would shrink our foot print [sic] adding these stations. After looking at the ground layout vs A5 I asked for a new Planograph-measured so I know where our boundaries end and what we have to work with. Photos were not possible but Scott did say he would provide photos of the new area.

Concerns; [sic]

- Size of operating area. If load integrity is fluid certified timely-it could work--could also be a choke point

- Fenced in area and fence line Northside.

- If our site is completely enclosed within HVF does this satisfy DLA Security and eliminate the need to remove-vegetation overgrowth and put to bed the fence issue?

On January 27, 2020, DLA DS received an email from Greg Lamb, President of defendant-intervenor Lamb, the company which had submitted the second-highest bid for the bridge contract, and which is the defendant-intervenor in the current protest before the court. Greg Lamb's January 27, 2020 email stated:

I am providing the information below so that it may be reviewed and considered when evaluating the award of the Tucson CDD DLA contract to the apparent high bidder. It is our belief that significant non-compliance may be occurring at the Apparent High Bidders [sic] site and they should be thoroughly investigated before the award of any contracts. I believe the information to be correct, compliance/environmental hazards serious and in the best interest of the Government to thoroughly evaluate the responsibility factors of the site operator prior to the award of the contract.

(capitalization in original). Greg Lamb's January 27, 2020 email also provided a bullet-point list detailing several concerns regarding HVF's facility, including that: (1) there was a "[p]otential accumulation of solid waste in the form of a substantial amount of tires estimating 20,000 in quantity as well as several other potentially uncharacterized waste piles throughout the property;" (2) "[t]he site is not permitted as a solid or special waste disposal facility;" (3) "[a]ny residual materials generated from their recycling process may not be characterized correctly;" (4) "[s]everal piles of Dirt and Dirt w/solid waste may be on site, that may contain unlawful amounts of Chromium, cadmium and possibly even PCBs depending on the age and makeup of the materials; (5) "[t]here is no reporting under EPCRA Section 313 – TRI; (6) even though an ECHO report "shows there is no violation . . . you will see there are also no current inspections;" and (7) a website link to a "Pima county interactive map which is time lapsed . . . will visually demonstrate what may be the accumulation of sloid [sic] waste over the last 10 years." (capitalization in original; emphasis omitted). Greg Lamb's January 27, 2020 email also "urge[d]" DLA DS "to contact the Arizona Department of Environmental Quality." Attached to Greg Lamb's January 27, 2020 email were Google Map photos of the HVF West facility from 2014 and 2018 showing the apparent accumulation of piles of material, including tires, over time.

In an email dated January 28, 2020, Anthony Stewart of DLA DS requested authorization from Eric Ray, DLA DS Environmental Operations Monitor, for another site visit of HVF's facility. Anthony Stewart wrote:

As per previous phone conversation, looking to get this done sooner than later [sic]. Have concerns regarding scrap tire build-up[.]

Please schedule this site visit as soon as possible and contact me before the site visit occurs so I can provide our desk audit findings.

The next DLA DS site visit of HVF occurred on February 3, 2020. In attendance for DLA DS were David Powell and Lisa Henninger. In attendance for HVF were William Elson, Senior Vice President and General Counsel, David Splan, Vice President and Environmental Manager, and HVF managers, Scott Laughlin and Joe Stead. Lisa Henninger of DLA DS completed a DLA Form 2537 for the February 3, 2020 site visit (the February 3, 2020 Form 2537). The responses provided in Lisa Henninger's February 3, 2020 Form 2537 were far more unfavorable regarding HVF's environmental responsibility in comparison to the responses in the January 14, 2020 DLA Form 2537 completed by Phillip Groll after the initial site visit of HVF by DLA DS on January 14, 2020. As discussed above, Phillip Groll provided in the January 14, 2020 Form 2537 that there were no environmental concerns at HVF's facility, and he had given HVF a "RESPONSIBLE" environmental assessment. The February 3, 2020 Form 2537 completed by Lisa Henninger concluded that HVF was "NON-RESPONSIBLE." (capitalization in original). The February 3, 2020 Form 2537 completed by Lisa Henninger of DLA DS also discussed the January 15, 2020 ADEQ inspection, stating:

> ADEQ performed an inspection for Solid Waste and Hazardous Waste. Deficiencies reported; not sufficient measure to prevent soil contamination; identified tire collection site requirements not met; observed aircraft parts with paint containing cadmium and chromium stored directly on soil; and observed storm water collection down gradient from pile of painted aircraft parts. The ADEQ also collected two samples of soil which the results included levels of chromium and cadmium. Due to the results of samples, HVF was sited [sic] for storing and disposing HW [hazardous waste] without a permit and disposing of HW directly into the environment.

(capitalization in original). The February 3, 2020 Form 2537 answered the question of whether there was "evidence of property being stored longer than 1 year," in the affirmative, and stated:

> HVF stated that the mounds of residue from scrapping processes is not waste but is a commodity product. They stated that the commodity is shipped for sorting to remove ferrous and non-ferrous metals for recycling. HVF did not provide any shipment documentation for commodity removals and could not provide any specifics for last removal time-frame or recycling location.

The February 3, 2020 Form 2537 also stated that DLA DS was "[u]nable to determine which commodities can be responsibly managed due to multiple environmental concerns." In a supplemental document to her February 3, 2020 Form 2537, Ms. Henninger stated:

> The HVF West site is a facility for scraping operations therefore some debris and refuse is understood. The concern is property is not segregated in any orderly fashion and designation areas for property such as tires is not determined. . . .

18

TIRES. The HVF West site does not have a tire collection permit through ADEQ. The need for a permit was identified in the ADEQ inspections on 1-15-2020 and DLA survey inspection on 2-3-2020. The site states that the tires are exempt from the permit because they are not Over The Road (OTR) tires. Although the site does receive some aircraft tires they also received vehicle tires which do require the site collection permit. Also, HVF West disposes of the tires on the Waste Tire Disposal Manifest as "OTR Tires" which contradicts their claim to being exempt.

(capitalization in original).

Lisa Henninger also detailed her concerns related to the February 3, 2020 HVF site visit in a February 14, 2020 internal DLA DS memorandum, which stated:

I, Lisa Henninger, am an Environmental Protection Specialist at the DLA Disposition Services Tucson site. I was assigned to perform the environmental portion of the Pre-Award Site Survey, DLA Form 2537, for HVF West. Area Manager, David Powell, and I conducted the survey on Monday, February 3, 2020, from approximately 0930.

We began our survey of the HVF West site in their conference room with company representatives Joe Stead, David Splan, William Elson and Scott Laughlin. The DLA Form 2537 was reviewed question by question for the HVF West Representatives to provide feedback. During this review they informed us that they were recently inspected by ADEQ and Pima County with no issues. They also informed us that there were soil samples taken and that the results were not available yet. We specifically reviewed the requirements of having a tire permit which they stated the site was exempt from due to their tires being off road and aircraft. I provided the ADEQ guidelines and requested them to provide documentation showing they were exempt. The review also required HVF West to provide documentation of their Spill Plan, outgoing invoices for waste disposal, hazardous manifests, and employee training requirements. We also discussed the disposal method for residue where they identified that the residue from demilitarization was a product. They continued that the residue was actually a commodity that they sell for metal recovery processes.

After reviewing the survey form we continued to perform a physical inspection of the entire HVF West site. During the physical inspection I observed the process for scrapping tires. The site has their own shredding machine however the tires were store [sic] at multiple locations throughout the yard. Next I evaluated the hazardous property storage space where requirements such as spill kits, fire extinguishers, no smoking signs were all met. Continuing the physical inspection I observed scrap property stored on the soil and several large mounds of processed residue that was

identified as a commodity by HVF West representatives. These mounds appeared to have been stored for a long period of time and would be estimated at 150 tons of residue property. I asked HVF West representatives how the commodity was disposed of which they answered, the process was propriety [sic]. I continued by asking what type of facility they use and when the last time a shipment was sent out however the representatives could not provide any answers. My observation is the mounds of property have been at the HVF West location for several years. Without any documentation or guidance on the disposal process I cannot verify that the property is being disposed of in accordance with regulations. The final physical evaluation location was the area of the HVF West yard that was designated for the DLA Disposition Services demilitarization process. The area was clear of any debris and was primarily soil with an exception of a cement pad on the South end with three walls. I informed the HVF West representatives that my survey results are contingent on providing the documentation to support their responses.

On February 5, 2020, I received an email from William Elson, attached were several documents to respond to the survey questions. They include two ADEQ reports from the inspection on January 15, 2020. The solid waste inspection was performed by ADEQ representative Anthony Stone listing environmental concerns to include; storage of tires, soil contamination, potential hazardous constituents of shredding materials and declared waste. Another concern was tires could not be stored on site more than 90 days. On February 15, 2020, Anthony Stone sited HVF with violation, A.A.C. R18-13-303(A)- Placing, depositing, or allowing to be placed or deposited refuse or other objectionable waste on a person's premises or on any public street, road or alley, and the violation was signed by Scott Laughlin. The hazardous waste inspection was performed by ADEQ representative Jenna Brickner. Her concerns included military scrap being placed directly on the soil, aircraft paint chips throughout property, and storm water contamination. During the inspection, two soil sample [sic] were retrieved due to concerns of hazardous aircraft paint being released into the soil and storm water. The results of the samples included levels of chromium and cadmium that were over the regulated limit. Due to these results, HVF West was cited for violation of storing and disposing hazardous waste without and permit and disposing hazardous waste directly into the environment.

I reviewed other documentation provided by HVF West to include an invoice for disposing tires, employee training checklist, Tier II reporting, and fire extinguisher inspection. I had multiple concerns of the documentation on waste tire disposal manifest identifying them as "OTR Tires". However, HVF West stated their tires were exempt because they were not over the road tires. Other documents were fuel being shipped for disposal on an invoice instead of a Hazardous Waste Manifest as required by EPA. The employee training checklist provided was for an employee on "2/5/2020" which was

two days after our survey with two of the major training requirements written in. HVF West provided Tier II reporting however they did not provide Tier III reporting as listed on the survey form. HVF West stated that they do not store or dispose of hazardous waste however the EPA number they provided on the Statement of Intent, AZR000521872, is registered as having RCRA activities described as "receiving hazardous waste from off-site."

Due to my findings during the inspection and my review of the documentation provided by HVF West, I found the contractor to have an environmental assessment of non-responsible. HVF West would need to resolve the ADEQ violations and obtain a tire permit at a minimum before consideration and reevaluation.

I, Lisa Henninger, swear that the above statements are accurate and true to the best of my knowledge.

(capitalization in original).

 Also on February 3, 2020, Mr. Elson of HVF sent the following email to DLA DS, and provided requested documentation to DLA DS:

Further to your and Lisa Henninger's visit this morning, you confirmed that the product piles in our yard will not inhibit the flow of material to the site in our 33 acre facility designated for receipt of what you had suggested could amount to 90 truckloads per week. You commented that the area we have designated and setoff was sufficient to accommodate the potential of receiving 90 truckloads a week.

In an internal DLA DS email dated February 6, 2020, David Powell, however, detailed his concerns from the February 3, 2020 HVF site visit:

My main concern is the process flow layout. Currently, we've been given a plot of land. It looks large enough but the question remains-how will it be set-up to function as a MUTB/Demil processing area? I don't believe Scott has grasped the idea of our flash to bang concept 12 days from induction to demil. When I asked what his plan was to separate Demil from MUB, how the 90 truck weekly turn-over will look like Scott said this is given post award. I said yes but I need a macro view of HVFs [sic] plan of attack. I reminded him once trucks begin to roll I need to know their process will handle the operation. Once again he's given DLA an area to work in but I don't see where he's going to place certain items of equipment needed; troch-cut, shearing, offloading box trailers and where incoming truck property is staged offloaded and worked. Reminding him both Demil/MUTB must be separated during the process. I asked Scott to give me a draft process flow of how items will go into and out of HVF.

(capitalization in original).

In a memorandum from Mr. Elson of HVF to Ms. Henninger of DLA DS, Environmental Specialist for DLA DS, detailing the February 3, 2020 DLA DS visit to the HVF site, Mr. Elson stated:

A. ADEQ and PIMA County Inspections.

We opened the meeting on February 3, 2020 advising you and Dave of an ADEQ site inspection at our facility on January 15 and a PIMA County RECRA inspection on January 31.

We advised you that the ADEQ site visit was in follow up to a complaint filed with the ADEQ by an individual whose name was not provided by the ADEQ. The reports that were generated following the ADEQ inspection were forwarded to Scott Laughlin by e-mail on January 28, 2020, consisting of a Solid Waste Field Inspection Report and a Hazardous Waste Inspection Report. There is information in the reports as well as pictures attached to each of the reports which contain confidential and proprietary process information. We consider the foregoing are consequently exempt from disclosure under 5 USC 552(b)(4).

Notwithstanding the notation in the e-mail to Mr. Laughlin that HVF West would receive additional materials from the ADEQ, in light of the historical directive from senior management to be proactive in circumstances with regulating authorities, we also advised you that following receipt of the ADEQ reports, we did not wait for further contact from the ADEQ, but that on January 30 we reached out to and spoke with Jenna Brickner, the Hazardous Waste inspector to discuss next steps. Jenna instructed us to speak with Brandon Green. We followed up with Mr. Green also on January 30 who advised us that we should follow up with Mr. Green's supervisor, Terry Bear. We have been in contact with Mr. Bear and expect to be meeting with him in the next several days.

During the ADEQ visit on January 15, Ms. Brickner thought that the follow up materials may include a request for a site assessment although she did not know the details of the breadth or extent that the site assessment may entail. Following our receipt of the ADEQ reports on January 28, we met with Brown and Caldwell on January 30, 2020 at the facility for in excess of 2 hours which concluded in our engaging the firm to assist with a site assessment and analysis, if required, and related issues that may arise in this regard. . . .

The Investigation reports from ADEQ are not final promulgations by the ADEQ under Arizona law. As we advised you and Dave, prior to the Arizona

visit on January 15, the last visit we had at our site was from PIMA County in 2014 which resulted in a letter from PIMA County concluding that HVF West was in compliance with the Pima County RECRA and solid waste permit was not required. A copy of the letter from PIMA County is attached. We had provided that letter to DLA previously. We told you and Dave that we have full intention to work expeditiously with the ADEQ to reach an acceptable plan of action to address these matters and that we are fully committed to proceed as required under Arizona law. Consistent with our initial reaction to the ADEQ reports, we will continue to be proactive with the ADEQ to reach an acceptable plan. We have both the intent and resolve to address and conclude these matters with the ADEQ as quickly as possible as required under Arizona and federal law. Note that we have the ability from a technical, financial and personnel perspective to timely address these matters with the ADEQ and to fully implement a plan of action once finalized.

We did not share with you during our meeting the particular technical expertise that we have in house. [Redacted], our Vice President of Environmental Affairs has 30 years environment experience including work with both federal and state environmental regulations and interacting with environmental agency representatives. [Redacted] leads our affiliated group of companies in environmental compliance and permitting. Before joining our affiliated group of companies on May 1, 2016, [redacted] had in excess of 28 years experience as a regulator working at the Michigan Department of Environmental Quality and the City of Detroit Water & Sewage Department. [Redacted] works with [redacted] on environmental compliance and permitting.

We have not received a report from PIMA County. Should we receive a report from PIMA County regarding their visit addressing RECRA matters, we will forward on to you. The Pima County inspectors who visited our site were Mr. James Jones, Air Quality Inspector, 520-724-7348, and Ms. Nora Atondo, RECRA Compliance Inspector, 520-724-7429. We have included their phone numbers should you wish to follow up with them.

B. Tires

As to your question regarding the need for a permit for the tires at our facility, attached are Arizona statute sections 44-1301 and 44-1304.01. Section 1301 defines both motor vehicle and off road motor vehicle. Section 1304 addresses requirements re 100 and 500 but is limited to only <u>motor vehicle tires.</u>

On page 2 of the ADEQ Solid Waste Field Inspection Report, Mr. Anthony Stone notes that aircraft tires, being off the road tires, are not subject to the tire collection site regulations.

Further, attached are examples of documents we receive [sic] from the Pima County Waste Tire Collection Facility at our delivery of tires. There are two examples attached one for 100 tons and the other of 158 tons, each of which are noted as off the road tires. We also attach a billing ticket from the land fill showing the tires as being nonstandard tires. Note, that the landfill has separate disposal charges for different categories of tires. Please see the attached fee schedule from Pima County indicating that charge for standard motor vehicle tires is $30 a ton while the charge for off the road tires is $150 a ton.

(capitalization and emphasis in original). On February 7, 2020, Ms. Henninger of DLA DS wrote the following internal email:

I have received the supporting documentation from the HVF representatives in response to our recent On Site [P]re-Award Survey. I am preparing the form DL2537 for submission however I wanted to forward the two ADEQ inspection reports that were conducted on January 15, 2020. These initial reports from ADEQ shows several deficiencies from HVF to include notice of tire storage violations, SWPPP violations and a violation for refuse being displaced on public property. The results of the inspections state a follow up is required to determine any further violations. I wanted to share these reports in advance so the results of the DL2537 are anticipated.

(capitalization in original).

On February 19, 2020, Mr. Elson emailed Ms. Henninger regarding the lab results of the soil samples HVF had sent for independent testing. Mr. Elson's February 19, 2020 email stated:

Lab results of the samples taken by ADEQ were analyzed for TCLP [Toxicity Characteristic Leaching Procedure] cadmium and total chromium. We were advised by the ADEQ that the State of Arizona does not have access to an in state lab capable of conducting an analysis for the presence of hexavalent chromium (chromium VI), and therefore the ADEQ lab results tested only for total chromium. We however wanted to know if there was hexavalent chromium in the samples taken by ADEQ. In response to our inquiry, the ADEQ suggested an out of state lab recognized by the ADEQ which had the capability of testing for chromium VI. We forwarded our split samples associated with those taken by the ADEQ to the recommended lab which conducted analyses for chromium VI and has determined that there was hexavalent chromium in the sample but at levels substantially below the State of Arizona non-residential levels identified in Arizona Administrative Code at 18-7-205.

We also had our split samples analyzed for total cadmium since Arizona Administrative Code Section 18-7-205 does not provide a level for TCLP cadmium. Therefore, soil remediation under the foregoing rule is not required in response to TCLP test results showing the presence of cadmium. The results of the lab analyses do however confirm that total cadmium, chromium VI, and trivalent chromium (chromium III) are at levels substantially below the non-residential level established under the Arizona Administrative Code section 18-7-205. Consequently, soils removal, remediation or treatment with the object to bring cadmium, chromium VI, and/or chromium III below the levels established under the foregoing rule are not required. The report from Legend Technical Services which had performed both total cadmium, TCLP cadmium and total chromium is attached. Legend Technical forwarded the sample to Pace Analytical National Tennessee who performed the TCLP for Hexavalent Chromium. The lab results from Pace Analytical are also attached under cover from Legend Technical.

Processed scrap metal, which includes metallic fines, is included in the definition of excluded scrap metal under federal law and correspondingly under Arizona law. Consequently, processed scrap metal is exempt as a solid waste under both federal and Arizona law. As a hazardous waste must first meet the definition of solid waste, if a material is not a solid waste it cannot be a hazardous waste. The TCLP test is used for the purposes of determining if a solid waste exhibits the characteristics of toxicity pursuant to 40 CFR 261.24. If a material is not a solid waste, then the TCLP test results are irrelevant since a material must be a solid waste in order to meet the definition of a hazardous waste. The grab samples pulled by the ADEQ included metallic fines which are not a solid waste and therefore cannot be a hazardous waste. Consequently the TCLP test directed to non-waste material was inappropriately used by ADEQ to draw a regulatory conclusion. We therefore take issue with the Hazardous Waste Report indication that we have stored or disposed of hazardous waste at our property which conclusion was based upon the TCLP test performed for the ADEQ.

(capitalization in original). On March 2, 2020, Tim Cronk of DLA DS' Environmental Field Office, who completed the "Final Report: Final Environmental Responsibility Determination" on HVF's proposed site for contract performance, discussed below, called ADEQ regarding HVF and detailed the phone call in an internal memorandum. The March 2, 2020 internal memorandum from Mr. Cronk stated:

SUBJECT: Phone Conversation with Arizona Department of Environmental Quality (ADEQ) Regarding HVF West.

I contacted Ms. Jenna Brickner of ADEQ on February 26, 2020 regarding HVF West and asked if she would send me a copy of her report. ADEQ

received a complaint concerning HVF West and conducted an environmental inspection on January 15, 2020.

I called Ms. Brickner on March 2, 2020 regarding her report to discuss her findings and if there was a plan for remediation at HVF West. The following are my questions and Ms. Brickner's responses:

*Tim Cronk* (TC) – The report you provided shows the Cadmium level at a level greater than the reportable limit yet I don't see anything in the report addressing the issue.

*Jenna Brickner* (JB) – We are working on an NOV (Notice of Violation) now and will be issuing to HVF West. We have recommended to them that they join our Voluntary Remediation Program which they have agreed to join. We will then work with them regarding the remediation of the soil and how to move forward with that remediation.

*TC* – So HVF West does not have a violation at this point due to the high levels of Cadmium but ADEQ will be issuing in the future, correct?

*JB* – That is correct. We are drafting now and have been in contact with HVF West recommending they join our program which they have agreed to join. We will then work with them on getting the soil cleaned up.

*TC* – Are you aware of the issues with the tires? I know Mr. Stone was the inspector but was wondering if you are aware of that situation. He stated there were several violations but he wrote up a single violation. Do you know if HVF West has a plan with ADEQ to remove the tires and if that plan is underway?

*JB* – I'm familiar with the situation but that is not my area of work. I do know HVF West began removing tires shortly after the inspection and have been removing them since. They are actively working to get those removed and get below the limit. I believe the Notice of Opportunity to Correct Deficiencies runs out in 90 days, which will be in April.

*TC* – So there is no formal plan but HVF West is working that issue and removing the tires. How do you know if they have complied with the 90 day removal requirement?

*JB* – Yes, they are and have been removing tires since the inspection. They will have to send us photos of the area to prove they have remediated the tires and removed them. It is incumbent upon them to prove they have removed the tires. ADEQ won't just conduct another inspection.

*TC* – Is it against the law for material to be placed directly on the soil in Arizona?

*JB* – It is not against the law. As long as it is Solid Waste, it can be placed on the soil but must have a containment system. That is allowed. If the material contaminates the soil, then it is against the law and they must remove the contaminants. We talked to HVF West and recommended that once they get the soil remediated for the Cadmium, they may want to put in a cement pad to work on. We have been in communication with them over this issue.

*TC* – Do you know if HVF West has applied or will apply for a permit?

*JB* – I'm not sure what kind of permit you are referring to but they do not have a Hazardous Waste Permit and I don't believe they are going to apply for one. They would only need a permit if they are going to treat hazardous waste.

(capitalization and emphasis in original).

In another internal memorandum dated March 2, 2020, Mr. Cronk detailed a phone conversation with Mr. Powell, who was present at multiple DLA DS inspections of HVF's proposed site for contract performance. The March 2, 2020 internal memorandum from Tim Cronk stated:

I called Mr. Powell to ask about taking photos of HFV [sic] West from the perimeter of the fence line. When the site visit took place in support of the Environmental Responsibility Determination (ERD), no photos were submitted with the report. I stated that since we did not take any photos during the visit, could he take photos through the fence [sic]. Mr. Powell stated that they had started taking photos during the visit and the owner of the facility called his attorney to ask if that was acceptable. Apparently, the attorney said no. The attorney also said to delete any photos already taken. Mr. Powell said the owner then walked over to him and witnessed Mr. Powell deleting the photos on his phone. The owner then stated no other photos were allowed.

On March 12, 2020, Tim Cronk of DLA DS completed an internal memorandum labeled: "Final Report: Environmental Responsibility Determination" (the Final Environmental Responsibility Determination), regarding HVF. The Final Environmental Responsibility Determination on HVF stated, in full:

This report is submitted as a result of a request from the DLA Disposition Services Sales Contracting Traditional Branch to conduct and [sic] Environmental Responsibility Determination (ERD) regarding Huron Valley

27

Fritz – West (HVF West). The review was conducted in accordance with Defense Logistics Agency Standard Operating Procedure (SOP 4715.06-01) dated September 17, 2018.

The ERD was completed on March 12, 2020 with a final recommendation of "NOT RECOMMENDED."

The initial ERD was assigned to and completed by Mr. Anthony Stewart of the DLA Disposition Services Environmental Branch. His initial report included the completion of the DLA Two-Way Memorandum from the Sales Office to the Environmental Office to include the checklist at the bottom of the two-way memorandum. He conducted a review of the Invitation for Bid, the Statement of Intent, and the Enforcement and Compliance History Online (ECHO). Mr. Stewart contacted HVF West on January 10, 2020 regarding the sale and completed the Destination Interview Questions. He also contacted the Arizona Department of Environmental Quality (ADEQ) on January 10, 2020 to conduct the Regulator Interview Questions. It was during this conversation that Mr. Stewart spoke with Ms. Jenna Brickner about HVF West and she indicated that ADEQ was scheduled to visit HVF West in the next few days. She also indicated that ADEQ would provide DLA Disposition Services a copy of the report when it was complete.

Two primary issues among others contributed to the "Not recommended" as a result of the ERD. The first issue that raised concern was outlined in the Arizona Department of Environmental Quality Hazardous Waste Inspection Report dated 1-15-2020. The report indicated two soil samples had been obtained from locations on HVF West's property that had been identified as an area to process Government property. It was also a location where visible paint chips on the ground were identified by the ADEQ inspector. The soil samples were sent to Eurofins TestAmerica in Phoenix, AZ for testing. The result of the soil sample indicated there were high levels of heavy metals to include Cadmium and Chromium. The results for the sample located at the base of the pile (sample 1), of Cadmium was 4.2 mg/L by Toxicity Characteristic Leaching Procedure (TCLP). The results for the sample from the soil downgradient of the pile, 4.9 mg/L for Cadmium by TCLP. In both instances, the level of Cadmium exceeded the maximum concentration of contaminants for the toxicity characteristics per the Hazardous Materials, Substances & Wastes Compliance Guide 2018/2019. Specifically, §261.24 (Toxicity characteristic), table 1 lists the regulatory level for Cadmium as 1.0 mg/L. The results of the soil sample 1 and soil sample 2 for Cadmium far exceed this limit.

Although the Chain of Custody report . . . indicated both a TCLP Chromium and a Total Chromium were ordered, only the total Chromium results were included in the Eurofins report. The results for the sample located at the base of the pile (sample 1), were 1100mg/kg for total Chromium. The results

for the sample from the soil downgradient of the pile (sample 2), were 480 mg/kg for total Chromium. The total Chromium results from the laboratory report indicate the probability of a level of Chromium significantly greater than the regulatory level. However, without a TCLP result, the Chromium level report was considered in the decision to not recommend HVF West but not as a regulatory violation as with the Cadmium.

A review of HVF West's records did not indicate they were authorized nor permitted by the Environmental Protection Agency nor the state of Arizona to Transfer, Store, or Dispose of Hazardous Waste. Additionally, Mr. Anthony Stone's Solid Waste Field Inspection Report dated January 15, 2020 noted an observation that HVF West had not created sufficient measures to reduce the potential of soil contamination from their recycling activities. Concrete had been installed on a large portion of the outdoor facility yard located around the processing building; however, the majority of the material on-site appeared to be sitting directly on bare soil.

On January 27, 2020, DLA received an email from Greg Lamb regarding issues at the Apparent High Bidders [sic] facility (HVF West's facility). Included in his email were several claims of regulatory violations regarding "potential accumulation of solid waste in the form of tires . . .," "solid waste permit violations and the lack of a special waste permit," "Automobile Shredder Residue accumulation violations," and "several piles of Dirt and Dirt w/solid waste may be on site." Included in the email were several Google Map satellite photos of HVF West's facility stating they were from 2014 through 2018. The photos clearly represented large piles of tires throughout the property. DLA Disposition Services Environmental Office then researched and retrieved Google Map Satellite photos of the same location at HVF West dated February 2020 showing tires in the same locations throughout the property. Some of the piles had grown in size and there appeared to be additional tires located throughout the property that were either in fewer numbers or not there at all in the 2014 Google satellite photo. These photos were used to verify the presence of large piles of tires on the property and confirm ADEQ[']s report of accumulating solid waste on the premises.

On January 28, 2020, DLA Disposition Services Environmental Office sent a Memorandum to Disposition Service Director West (DSD West) directing an on-site Survey of the HVF West facility in accordance with the SOP. In an effort to ensure all personnel understood the tasking for the site survey, DLA Disposition Services Environmental Office held a teleconference on January 31, 2020 with DSD West and the Tucson survey team. On Feb 2, 2020, Disposition Services Tucson sent Ms. Lisa Henninger and Mr. David Powell to the HVF West facility to conduct the on-site survey. Ms. Lisa Henninger submitted her PRE-Award/Post-Award on-site HM/HW Recycler/Processor Manufacturer report (DLA Form 2537) dated February

3, 2020. Included in her report were several enclosures to support her site survey. On February 14, 2020, Ms. Lisa Henninger submitted her PRE-AWARD/Post-Award on-site HM/HW Recycler/Processor Manufacturer report (DLA Form 2537) dated February 3, 2020. Included in her report were several enclosures to support her site survey. On February 14, 2020, Ms. Lisa Henninger submitted a Memorandum for Record where she detailed her site survey/visit and provided additional details of the visit, conversations, and observations. In her memorandum, Ms. Henninger addresses her concerns regarding responses from HVF West to her questions. Her Memorandum stated HVF West would not or could not answer specific questions about tire disposal. When pressed regarding tire disposal, HVF West responded that the information was "proprietary." Ms. Henninger summed up her Memorandum by stating "due to my findings during the inspection and my review of the documentation provided by HVF West, I found the contractor to have an environmental assessment of non-responsible." These issues along with her summation of a not responsible support the Environmental Office conclusion to not recommend this sale.

On March 2, 2020, DLA Disposition Services Environmental Office contacted the ADEQs Resource Conservation and Recovery Act (RCRA) inspector (Jenna Brickner) who conducted the Hazardous Waste portion of the inspection. The ADEQ report did not address their future intentions for the heavy metal violation. The report listed these observations but did not address nor imply there was any kind of violation or that HVF West would receive a Notice of Violation (NOV) for the high level of Cadmium. ADEQ's Ms. Jenna Brickner stated during the phone call that ADEQ was in the process of issuing a NOV to HVF West for the heavy metal Cadmium. She did not state when she though the NOV would be complete or when it might be issued to HVF West. She also did not state when the remediation must be completed but that it would be stipulated in the NOV itself. She did state that HVF West is cooperating with the ADEQ and the two entities are working to put a plan together for HVF West.

The second issue noted by the ADEQ cited HVF West was "Placing, depositing, or allowing to be placed or deposited refuse or other objectionable waste on a person's premises or on any public street, road, or alley." A.A.C. R18-13-303(A). This was noted in Mr. Anthony Stone's Solid Waste Field Inspection Report dated Jan 15, 2020. Mr. Stone's report provided a synopsis of HVF West's tire procedures and operation and recommended best practices regarding fire suppression for tires. The report also stated that HVF West was informed that "anything declared a waste (tires or waste generated from shredding activities) is not allowed to remain on the property longer than ninety days or it considered [sic] improper disposal of solid waste."

DLA Environmental Office contacted Mr. Stone on or about Feb 11, 2020 regarding this issue. Mr. Stone stated that the amount of tires and the number of violations he noted at HVF West caused him to issue a single Solid Waste violation for improper tire storage instead of individual citations for each violation. During the conversation, Mr. Stone indicated that HVF West was allusive [sic] and evasive in their responses to his questions. Mr. Stone also stated that when HVF West was asked certain questions regarding their processes and procedures for disposing of tires, they stated that the information regarding the tires was "proprietary" and they would not answer. The report provided to DLA Disposition Services by ADEQ included a "NOTICE OF OPPORTUNITY TO CORRECT DEFICIENCIES" with the violation:

"A.A.C. R18-13-303(A) Placing, depositing, or allowing to be placed or deposited refuse or other objectionable waste on a person's premises or on any public street, road or alley."

The Notice states: "Within 90 calendar days of the date of this notice; please submit documentation to the ADEQ contact above demonstrating that no violation has occurred or documentation that the alleged deficiency has been corrected. Acceptable documentation includes, but is not limited to photographs, receipts, standard operating procedures, and/or relevant logs.

**Once ADEQ has received the requested documentation, the case will be closed and a letter will be issued stating that the agency will take no further action as a result of this inspection."**

On March 2, 2020 DLA Disposition Services Environmental Office contacted our DLA Representative Mr. David Powell from the Tucson, AZ office regarding his site visit. The subject of the conversation was the lack of photos provided by his team during the visit. Mr. Powell stated he began to take photos of the area where DLA Disposition Services property would be processed by HVF West. He then stated that a representative from the HVF West team accompanying him during the tour of the property called an HVF West attorney and asked if photos should be allowed as part of the tour. The representative then asked Mr. Powell to cease taking photos and asked him to delete the photos he had already taken. To ensure Mr. Powell deleted the photos, the representative visually observed Mr. Powell delete the photos. This gave concern to our team that HVF West was not fully cooperating with DLA in accordance with the Invitation for Bid (A0008025) which states "the apparent high bidder shall cooperate fully with the Government when informed by the Agency of an ongoing investigation by any DOD or Federal Government Investigation service or agency or during the Agency's Compliance Reviews or Audits."

The issue noted by the ADEQ regarding solid waste (tires) was the second of two issues that caused DLA Disposition Services concern and resulted in our submission of a "not recommended" in our report. HVF West had nearly 4 times the allowable amount of Cadmium in the soil according to the Hazardous Materials, Substances & Wastes Compliance Guide 2018/2019 at their facility. Although the Total Chromium report from Eurofins is non-conclusive due to the report nature, it does provide concern regarding the amount of Chromium in the soil. The facility was given 90 days to remove the tires and submit proof to ADEQ regarding their compliance with the citation. The DLA Environmental Office, through their Environmental Responsibility Determination process, concludes it would not be prudent to issue material to this company given they had just been cited by the regulating authority in Arizona for excessive heavy metals in the ground and a solid waste violation that is still within the remedy time frame (90 days). This Sale is NOT RECOMMENDED.

(capitalization and emphasis in original; internal references omitted).

On March 13, 2020, Todd Koleski, the Sales Contracting Officer for DLA DS assigned to the bridge contract at issue in the above-captioned protest, wrote a letter to Scott Laughlin of HVF, informing him of the DLA DS non-responsibility determination with regard to HVF. The March 13, 2020 letter stated, in full:

Dear Mr. Laughlin:

1. Upon examining HVF's capability to perform the requirement in an environmentally compliant manner, examining the types of information and evidence outlined in the IFB, and review of e-mails and documents from HVF West regarding the company's responsibility generally and arguments regarding ADEQ findings specifically, e.g., February 5, 10, and 19 HVF West e-mails, I cannot make an affirmative determination that HVF West LLC is a responsible high bidder to purchase the property and perform the requirements of Disposition Service Invitation for Bid A0008025.

2. Section 4, paragraph 7, subparagraph g states: "prior to award, the Agency will conduct a pre-award survey of the apparent high bidder." The solicitation further provided that "the pre-award survey . . . may include but is not limited to a review of the apparent high bidder's facilities and equipment, financial capability or disclosure of the apparent high bidder's financial condition, quality assurance, safety, environmental responsibility, and transportation. The apparent high bidders shall cooperate in the pre-award vetting process by assisting in arrangements and/or by providing requested information in a timely manner." The agency takes these measures to ensure that a potential awardee can perform the requirement of the IFB in an environmentally compliant manner.

3. As noted above, I am unable to make an affirmative determination that HVF West LLC is a responsible high bidder, for the following reasons:

First, HVF West LLC did not fully cooperate in the pre-award vetting process. Specifically, DLA personnel were not allowed to take all required pictures required for the environmental assessment. Additionally, what few photos were taken were required to be deleted in the presence of your personnel. Anytime DLA personnel asked questions concerning disposal, the reply was, "that is proprietary information."

Second, during the environmental responsibility determination (ERD) assessment, there were a number of deficiencies identified at your facility that raise significant concerns with the non-complaint manner in which solid wastes have been managed. The two primary issues identified in the ERD are outlined below.

a. DLA learned that the Arizona Department of Environmental Quality (ADEQ) had conducted a solid waste inspection and a hazardous waste inspection of your facility. Their report indicated two soil samples had been obtained from locations on HVF West's property in areas identified in an area used to process Government property. The soil samples were sent to Eurofins Test America in Phoenix, AZ. The results of the soil samples indicated that HVF West had nearly four (4) times the allowable Cadmium in the soil per the Hazardous Materials, Substances & Wastes Compliance Guide 2018/2019. Additionally, although the chain of custody report noted that both TCLP Chromium and Total Chromium were ordered, only total Chromium results were included in the Eurofins report. The total Chromium results from the laboratory indicate the probability of chromium significantly greater than the regulatory level. Upon contacting the ADEQ, DLA learned that a Notice of Violation for the high level of Cadmium was forthcoming and the NOV would require remediation.

b. The second issue was noted by the ADEQ in a Solid Waste Field Inspection Report dated Jan 15, 2020. As a result of that report, HVF West was cited for "Placing, depositing, or allowing to be placed or deposited refuse or other objectionable waste on a person's premises or on any public street, road, or alley." A.A.C. R18-13-303(A). The report noted an observation that HVF West had not created sufficient measures to reduce the potential of soil contamination from their recycling activities. Specifically, concrete had been installed on a large portion of the outdoor facility yard located around the processing building; however, the majority of the material on-site appeared to be sitting directly on bare soil. The report also noted that tires or waste generated from shredding activities were not allowed to remain on the property longer than ninety days or it is considered improper disposal of waste. DLA contacted the ADEQ regulator on or about Feb 11, 2020 to discuss the report and findings. The ADEQ regulator stated

that the amount of tires and the number of violations he noted at HVF West caused him to issue a single Solid Waste violation for improper tire storage instead of individual citations for each violation. During the conversation, the regulator indicated that HVF West was elusive and evasive in their responses to his questions. He also stated that when HVF West was asked certain questions regarding their processes and procedures for disposing of tires, they stated that the information regarding the tires was "proprietary" and they would not answer. HVF West was given 90 days to remove the tires and submit proof to ADEQ regarding their compliance with the citation.

3. Due to the concerns raised by the above information over the non-compliant manner in which solid wastes have been managed at the facility HVF intends to use for recycling, the violations noted by regulators, including ongoing or uncorrected non-compliance, there is an unacceptable risk that property released by DLA would not be managed in a compliant manner or would have the potential to cause the agency to incur future liability under state or federal laws and regulations governing the remediation or clean-up of environmentally contaminated sites. For the above reasons, I have made the determination that your firm is not a responsible bidder under Disposition Service Invitation for Bid A0008025.

4. This is considered a final agency action on our evaluation of you as the apparent high-bidder under Invitation for Bid A0008025.

(capitalization in original).

After finding HVF non-responsible, DLA DS proceeded to consider Lamb for the award of the bridge contract currently at issue, as Lamb had submitted the second-highest offer in response to the bridge contract solicitation, No. A0008025. Lamb provided DLA DS with the required documents, including: Statement of Intent; End-Use Certificate; Employee Training Matrix; documents related to Lamb's Waste and Service Vendors; Licenses and Permits; training attendance log; and spill response and clean up.

On March 19, 2020, Jennifer Bechtel of DLA DS contacted ADEQ regarding Lamb. A conversation record completed by Jennifer Bechtel detailed the conversation as follows:

ADEQ just got an anonymous complaint yesterday and will do an inspection in the next few weeks on Lamb. She will send a different inspector this time (than sent for HVF West). "Doesn't want to be in the middle." Will know more in time. She will send an impartial inspector.

Also on March 19, 2020, Tim Cronk sent the following internal DLA DS email to schedule a DLA DS conference call regarding inspecting the Lamb facility:

This meeting is to discuss the upcoming site visit at Lamb Depollution in Tucson, AZ. (1100 Eastern Time Zone) Due to the intense scrutiny this

Scrap Sale is under, we want to ensure we are thorough during our visit. As you probably know, HVF West received a "not recommended" from the Environmental Office. I then had to provide a final report supported by 25 enclosures. The report was well over 100 pages. At any rate, want to make sure we are on the same page as this will also get litigated at some point.

Topics to consider:

- Permit review
- Environmental Liability Insurance review
    - Safety review
    - Site walk-thru
    - photos of site
        - if photos are not allowed, detail every square foot of property covered.
        - noted areas of discolor
        - noted areas of excessive scrap/clutter
        - Material on hand
        - Material status (on ground or concrete)
        - Number of tires on hand
- Review of manifest removing property
- Review of sales receipts removing property
- Storm Water permit review
- Storm Water prevention Plan

I know I'm missing several topics but the checklist should fill in the gap.

Also on March 19, 2020, DLA DS conducted a pre-award inspection of Lamb's facility, which was detailed in a March 19, 2020 DLA Form 2537, completed by Lisa Henninger (the March 19, 2020 Form 2537). The March 19, 2020 DLA Form 2537 for Lamb stated that "As of 3/19/2020, Lamb Depollution has not received a regulatory inspection at their new location on Nebraska Street in Tucson, Arizona." The March 19, 2020 Form 2537 also stated that "[a]s of 3/19/2020, Lamb Depollution has not received an official fire/safety inspection. However, Greg Lamb advised that the site was in contact with local authorities to schedule an inspection. The inspection date was still pending at time of the survey." The March 19, 2020 Form 2537, however, did not indicate any environmental concerns at Lamb's facility, and concluded that "Lamb Depollution can responsibly manage the commodities of scrap and waste as long as they move the property efficiently," and Lamb was given a "RESPONSIBLE" environmental assessment. (capitalization in original). In a supplemental statement in support of the responses provided in the March 19, 2020 Form 2537, Lisa Henninger explained that there was property being stored at Lamb's facility, but stated that "[t]he Lamb Depollution site has not been in operation for a year therefore it is assumed that the property present has not been stored over a year. During survey review, the scrap we being segregated as well as a truck being loaded. Based on these findings it would be determined that the current

property is actively being moved. [sic]" The supplemental statement written by Lisa Henninger also stated:

> The Lamb Depollution site is for a scrapping process [sic] therefore some housekeeping issues is [sic] expected. During the visual survey it was observed that the scrap was segregated and organized and employees were using racks to ensure the areas were free from loose debris. Several areas the scrap was on wood plates, metal plates or contained in liners [sic]. However, in the sheering operation area the scrapping process did occur directly on the soil. Recommendation would be to ensure property with high risk of discharge not be processed directly on the soil and that scrapping process required to be processed on the soil not be stored for long periods of time.

As noted above, on March 18, 2020, ADEQ received an anonymous complaint regarding the Lamb Depollution facility. On March 23, 2020, a complaint receipt form was generated by Jenna Brickner of ADEQ, which described the anonymous complaint as follows:

> The site has historically been used and is believed to be currently being used [sic] to process Department of Defense aircraft aluminum, other Department of Defense metallic and non-metallic materials and metals from other sources. It is believed that processing takes place directly on and over the soils. As such, the potential exists for the presence in the soils, with the further potential exposure to surface and ground water, of metallic constituents consisting of but not limited to cadmium, chromium, lead and mercury, potentially constituting storage and disposal of hazardous and solid wastes.

In response to the anonymous complaint, ADEQ performed an inspection of Lamb's facility on April 1, 2020. ADEQ generated a Hazardous Waste Inspection Report, completed by Jenna Brickner. The Hazardous Waste Inspection Report stated that "[n]o deficiencies were noted during the course of the inspection" and that "[n]o ADEQ action will result from this inspection." The Hazardous Waste Inspection Report also found no "'risk to any person, the public health, safety or welfare or the environment' per ARS § 41-1009." In the section for inspector observation and notes, the Hazardous Waste Inspection Report stated:

> At the time of the inspection, the facility was not open for business. When operating, the facility accepts and processes end of life aircraft, avionics, textiles, body armor, parachutes, vehicles (including tires), glass, textbooks, et al. for recycling. Scrap is separated and stored in separate bermed areas. Concrete barriers surround 3 sides of each pile. Both unprocessed and processed scrap metal is stored on top of a metal sheet with the aim of minimizing soil contamination. Mr. Lamb told ADEQ that none of the materials brought in from their customers is waste. All materials listed above

are accepted at the facility to be recycled. The only exception to this is when a vehicle arrives which still contains fuel, lubricants, or other fluids. The facility will not accept vehicles containing these and other fluids and they are rejected and returned to the customer. Everything is recycled except in the event that vehicle fluid removal is needed, however, the facility policy is to reject vehicles that still contain liquids.

The April 1, 2020 ADEQ inspection of Lamb's proposed site for contract performance also generated a Solid Waste Field Inspection Report, completed by Anthony Stone. As did the Hazardous Waste Inspection Report, the Solid Waste Field Inspection Report on Lamb also stated that "[n]o deficiencies were noted during the course of the inspection," and that "[n]o ADEQ action will result from this inspection."

On April 3, 2020, Tim Cronk of DLA DS completed Lamb's "Final Environmental Responsibility Determination," which stated:

> This report is submitted as a result of a request from the DLA Disposition Services Sales Contracting Traditional Branch to conduct and Environmental Responsibility Determination (ERD) regarding Lamb Depollution (aka Lamb Fuels). The review was conducted in accordance with Defense Logistics Agency Standard Operating Procedure (SOP 4715.06-01) dated September 17, 2018.

> The ERD was completed on April 3, 2020 with a final recommendation of "RECOMMENDED."

> The initial ERD was received from the Sales office on March 16, 2020 and assigned to Ms. Jennifer Bechtel of the DLA Disposition Services Environmental Branch. Shortly after receiving the assignment, Ms. Bechtel took a position with the Air National Guard and was re-assigned prior to completing the ERD. Prior to her departure, she conducted a review of the Invitation for Bid, [and] the Statement of Intent. A review of the Enforcement and Compliance History Online (ECHO) returned no results for Lamb Depollution. She also contacted the Arizona Department of Environmental Quality (ADEQ) on March 19, 2020 to conduct the Regulator Interview Questions. It was during this conversation that Ms. Bechtel was informed by Ms. Jenna Brickner that ADEQ had received an anonymous complaint directed at Lamb Depollution. Ms. Brickner indicated that she was not sure when ADEQ would visit Lamb Depollution but it would be in the next two weeks.

> On March 17, 2020, DLA Disposition Services Environmental Office sent an email to Disposition Service Director West (DSD West) directing an on-site Survey of the Lamb Fuels facility in accordance with the SOP. In an effort to ensure all personnel understood the tasking for the site survey, DLA Disposition Services Environmental Office held a teleconference on March

19, 2020 with DSD West and the Tucson survey team. On March 19, 2020, Disposition Services Tucson sent Ms. Lisa Henninger, Mr. David Powell, and Mr. Forrist Richardson to the Lamb Fuels facility to conduct the on-site survey. Ms. Lisa Henninger submitted her PRE-Award/Post-Award on-site HM/HW Recycler/Processor Manufacturer report (DLA Form 2537) signed March 25, 2020 with an attachment that expounded on the report itself. The team were not allowed to take photos with their own cameras or phones but were provided a Lamb Fuels phone to take photos. Lamb then reviewed the photos on the phone and sent them to the Tucson Team. The Tucson Team stated they did not believe any photos had been removed. Included in Ms. Henninger's report were several enclosures to support her site survey which are available upon request (see list below). Mr. Dave Powell also submitted a report via email and is available upon request. No negative input was reported by Mr. Powell.

On March 30, 2020, Tim Cronk contacted the PIMA County Fire Department in Tucson, Arizona and spoke with Willie Treach. Mr. Treach is the Fire Marshall for PIMA County and handles permits for specific activities. He stated that he had recently visited Lamb Fuels and was concerned over the fact that they were missing several permits for operations they were conducting at the site. He stated that Lamb Fuels reviewed all the requirements with him and are working closely to obtain the necessary permits. Lamb Fuels did not have a permit to operate a plasma cutter, operate a secure gate, use mobile trailers onsite, and had not provided their emergency information to the Fire Marshall. When asked about the operations at Lamb Fuels and if the Government should sell scrap material to this buyer, Mr. Treach had no reservation in supporting the sale. . . .

One [sic] April 1, 2020, Tim Cronk contacted Mr. Greg Lamb of Lamb Fuels to conduct the buyer interview. Mr. Lamb was just finishing up with the Arizona Department of Environmental Quality and after the ADEQ departed, we completed our conversation regarding the sale. Mr. Lamb was forthright and did not hesitate to answer questions. During the conversation, Mr. Lamb stated he already had a copy of the ADEQ inspection that had just concluded and would forward a copy. I noted no outstanding issues or causes for concern during the interview.

Lamb Depollution, also known as Lamb Fuels, appears to be a responsible partner with the City of Tucson, AZ and an environmentally responsible business. The ADEQ report had no negative findings other than minor admin issues. The local Fire Department had no additional issues with Lamb Fuels other than those noted above and were confident Lamb Fuels would continue to cooperate. The Fire Marshall had no concerns that Lamb Fuels would obtain the necessary permits. A search of the internet revealed no negative reviews of the company. A Google Map search did not appear to show hazardous material, tires or debris scattered about the site.

Additionally, an ERD had been recently conducted at this site in July 2019 with a positive review. Below is a list of other documents available that not [sic] included in this report.

- Business License
- Google map photos
- Responsible Recycling (R2) Assessment Report
- ADEQ Exit Debriefing with Notice of Inspection Rights
- Facility Permits and Registrations
- Tier II Reporting
- Lamb Employee Health and Safety training
- Employee Training Overview
- Lamb Depollution SPCC and Emergency Plans
- Fire Extinguisher Training and Log
- PPE Training and Certificate
- Log of Disposal Documentation
- Lamb Depollution R2 SOP
- Dave Powell Site Visit Assessment emails

Based on the information provided in this report, DLA Disposition Services Environmental Branch finds Lamb fuels responsible and submits a 'RECOMMENDED' for this sale.

(capitalization in original; internal references omitted). On April 13, 2020, a "Notice of Award, Statement, and Release Document" was issued with Lamb as the awardee of Solicitation No. A0008025, for the bridge contract currently at issue.

## DISCUSSION

As indicated above, the defendant and defendant-intervenor moved to dismiss the above-captioned bid protest, Case No. 20-541, regarding the contract award pursuant to the bridge contract Solicitation, Solicitation No. A0008025, for lack of subject-matter jurisdiction. Both argue, similar to their arguments in the earlier bid protest brought by HVF before Chief Judge Sweeney in HVF West I, that pursuant to 28 U.S.C. § 1491(b)(1), the bridge contract Solicitation is one not for a government procurement because it is for a sales contract, and, therefore, that this court does not have jurisdiction to review protestor's protest. Protestor responds in the current bridge contract case, as it did before Chief Judge Sweeney in HVF West I with regard to the original contract, that the Solicitation is for a "mixed-transaction," because it involves services of removal, demilitarization and mutilation of government property, in addition to the government's sale of the property. The defendant and defendant-intervenor state that the mixed-transaction analysis, which was approved in Chief Judge Sweeney's decision in HVF West I, remains incorrect, and that it has never been upheld by the United States Court of Appeals for the Federal Circuit. Alternatively, defendant and defendant-intervenor try to argue that, even under the mixed-transaction analysis, the court still lacks jurisdiction

because the services provided to the government in the bridge contract at issue are not "more than de minimis."

It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428 (2011); see also Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990))); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." Arbaugh v. Y & H Corp., 546 U.S. at 506; see also Hymas v. United States, 810 F.3d 1312, 1317 (Fed. Cir. 2016) (explaining that a federal court must satisfy itself of its jurisdiction over the subject-matter before it considers the merits of a case); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise sua sponte, even where . . . neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006)).

The Tucker Act, 28 U.S.C. § 1491, grants jurisdiction to this court as follows:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive

department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).

Additionally, regarding bid protests, the Tucker Act provides that this court has

jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1). The Administrative Dispute Resolution Act of 1996 (ADRA), codified at 28 U.S.C. § 1491(b)(1)–(4), amended the Tucker Act to establish a statutory basis for bid protests of federal government procurements in the United States Court of Federal Claims. See Acetris Health, LLC v. United States, 949 F.3d 719, 728 (Fed. Cir. 2020); Hymas v. United States, 810 F.3d at 1317; Palladian Partners, Inc. v. United States, 783 F.3d 1243, 1252 (Fed. Cir. 2015); Systems Application & Technologies, Inc. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012); Distributed Solutions, Inc. v. United States, 539 F.3d 1340, 1345 (Fed. Cir. 2008); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001).

Jurisdiction for Mixed-Transaction Contracts

Defendant and defendant-intervenor argue that the bridge contract currently before the court for removal, demilitarization, mutilation, and sale of government property should be governed by the United States Court of Appeals for the Federal Circuit's ruling in Resource Conservation Group, LLC v. United States, 597 F.3d 1238 (Fed. Cir. 2010). In Resource Conservation Group, the protestor, Resource Conservation Group, brought a protest of the government's solicitation of bids to lease real property owned by the United States Naval Academy. See id. at 1240–41. According to the discussion in the Federal Circuit's opinion, the United States Court of Federal Claims trial court judge "held that it lacked jurisdiction under 28 U.S.C. § 1491(b)(1) to adjudicate bid protests involving leases of land where the government is the lessor, because such an action is not 'in connection with a procurement or proposed procurement,'" and the trial court dismissed the bid protest. See Res. Conservation Grp., v. United States, 597 F.3d at 1242 (quoting 28 U.S.C. § 1491(b)(1)). Upon appeal, the United States Court of Appeals for the Federal Circuit considered "whether RCG's [Resource Conservation Group's] claim falls within the jurisdiction conferred by section 1491(b)(1), the new jurisdictional provision enacted by the ADRA," and concluded that "the Court of Federal Claims correctly held that it does not." Res. Conservation Grp., LLC v. United States, 597 F.3d at 1243.  The Federal Circuit in  Resource Conservation Group stated that 28 U.S.C. § 1491(b)(1) "expanded the jurisdiction of the Court of Federal Claims to hear bid protest cases, ultimately giving the court exclusive jurisdiction to review 'the full range of procurement protest cases previously subject to review in the federal district courts and the Court of Federal Claims.'"

See Res. Conservation Grp., LLC v. United States, 597 F.3d at 1243 (quoting H.R. Rep. No. 104–841, at 10 (1996) (Conf. Rep.)). Although 28 U.S.C. § 1491(b)(1) does not define the term "procurement," the Federal Circuit in Resource Conservation Group applied the definition of "procurement" as the term was defined in 41 U.S.C. § 403(2), now codified at 41 U.S.C. § 111 (2018), as including "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" 41 U.S.C. § 111; Res. Conservation Grp., LLC v. United States, 597 F.3d at 1244 (quoting 41 U.S.C. § 403(2) (2006)). The Federal Circuit concluded that "the Court of Federal Claims was correct in holding that relief under 1491(b)(1) is unavailable outside the procurement context," and affirmed that portion of the lower court's decision. See Res. Conservation Grp., LLC v. United States, 597 F.3d at 1245. The United States Court of Appeals for the Federal Circuit in Resource Conservation Group reversed the portion of the Court of Federal Claims' decision which had found that the enactment of 28 U.S.C. § 1491(b)(1) removed the United States Court of Federal Claims' jurisdiction for nonprocurement-based protests under 28 U.S.C. § 1491(a)(1). See Res. Conservation Grp., LLC v. United States, 597 F.3d at 1247 ("We conclude that the Court of Federal Claims did not have jurisdiction under 28 U.S.C. § 1491(b)(1), but had jurisdiction under section 1491(a)(1) because the implied-in-fact contract jurisdiction in nonprocurement cases that existed prior to 1996 survived the enactment of the ADRA.").[4]

Although the Federal Circuit affirmed the lower court's decision that the solicitation at issue in Resource Conservation Group could not be protested under 28 U.S.C. § 1491(b)(1) because it did not meet the definition of a procurement for the purposes of determining jurisdiction, nowhere in Resource Conservation Group did the Federal Circuit state that any government contract which  involves a lease, or sale, of property by the United States is outside of the jurisdiction conferred to this court by 28 U.S.C. § 1491(b)(1). The solicitation at issue in Resource Conservation Group only involved the lease of United States' real property, and did not also involve services received by the United States. The Federal Circuit in Resource Conservation Group did not address the

---

[4] Some judges of the United States Court of Federal Claims, however, have found that injunctive relief is unavailable under 28 U.S.C. § 1491(a)(1). See Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 41 (2013) ("Although the Federal Circuit has not had occasion to rule on the issue of whether the Court of Federal Claims has authority, post-ADRA, to grant equitable relief in implied contract bid protests pursued under section 1491(a), this court has consistently answered that question in the negative." (citing Terry v. United States, 96 Fed. Cl. 131, 153 (2010) ("Under section 1491(a)(1), plaintiff is precluded from obtaining equitable relief, which is only available for a section 1491(b)(1) protest, and is limited to a recovery of monetary damages that comprise the costs she incurred while preparing her proposal.", vacated in part on other grounds, 98 Fed. Cl. 736 (2011)); FAS Support Servs., LLC v. United States, 93 Fed. Cl. 687, 694 (2010); Overstreet Elec. Vo v. United States, 47 Fed. Cl. 728, 731 n.5 (2000); W & D Ships Deck Works, Inc. v. United States, 39 Fed. Cl. 638, 641 (1997)). Protestor in the above-captioned protest does not invoke this court's implied-in-fact jurisdiction under 28 U.S.C. § 1491(a)(1), and only seeks injunctive relief.

issue of whether a mixed-transaction contract that involves the sale of government property, but also involves the United States' acquisition of services to its benefit, falls within this court's jurisdiction under 26 U.S.C. § 1491(b)(1). Therefore, although the defendant and defendant-intervenor argue that Resource Conservation Group excludes all sales contracts from this court's protest jurisdiction under 28 U.S.C. § 1491(b)(1), including the one at issue in the above-captioned protest, the Federal Circuit's decision in Resource Conservation Group does not resolve the issue.

Defendant and defendant-intervenor further argue that the United States Court of Appeals for the Federal Circuit addressed this issue in the unreported, nonprecedential decision of Creation Upgrades, Inc. v. United States, 417 F. App'x 957 (Fed. Cir. 2011). The court notes that the contract at issue in Creation Upgrades involved the sale of government real property, and, similar to the contract at issue in Resource Conservation Group, did not appear to have involved significant services to be delivered to the United States as part of the contract.[5] The unreported Federal Circuit decision in Creation Upgrades stated:

> In Resource Conservation, we construed "procurement" to mean "the process of acquiring property or services." 597 F.3d at 1244 (quoting 41 U.S.C. § 403(2)) (emphasis omitted). Therefore, we held that a solicitation

---

[5] Although neither the unreported Federal Circuit decision in Creation Upgrades, nor the unreported trial court decision, see Creation Upgrades v. United States, Case No. 09-00788C, 2010 WL 1255684 (Fed. Cl. Mar. 24, 2010), discussed any conditions of sale which were required to be met by the awardee in connection with the solicitation that was at issue, the defendant-intervenor in the above-captioned protest cites to the filing of the Creation Upgrades solicitation when the case was before the trial court, and requests the court to take "judicial notice" that the solicitation "attached conditions to the sale" of the real property, and tries to argue a similarity between the Creation Upgrades solicitation and the bridge contract Solicitation currently at issue. (emphasis omitted). Defendant-intervenor in the above-captioned protest states:

> Importantly, like the Solicitation in this matter, the invitation for bid in Creation Upgrades ("IFB") **attached conditions to the sale of the Navy's land**. . . . [A]s a condition of sale and "conveyance of title to Sale Parcel I, the Winning Bidder [was] required to enter into a LIFOC [Lease in Furtherance of Conveyance] . . ." (IFB at p. 5, Doc. 7-6 at p. 7.) Through the LIFOC and sale of its land, the Navy acquired certain "protection and maintenance services" from the awardee as a condition of the sale. (IFB at p. 41, LIFOC at ¶ 12.1; Doc. 7-6 at p. 43.) Moreover, the LIFOC required the awardee to provide and/or arrange for "housekeeping . . . security protection . . . fire protection" and "other services . . ." (IFB at p. 42 at ¶ 12.2.1-5; Doc. 7-6 at p. 44.) Title to the land – either in full or carve-out areas within the parcel – would pass to the IFB awardee only after the environmental remediation was complete. (IFB at p. 5; Doc 7-6 at p. 7.)

(first ellipses added; emphasis and alterations in original; footnotes omitted).

for the lease of government property was not a "procurement" under § 1491(b)(1) because the government was not "acquiring property or services." Id.

Creation Upgrades, Inc. v. United States, 417 F. App'x at 959. The Federal Circuit in Creation Upgrades further stated that it saw "no meaningful distinction between the lease" of government property in Resource Conservation, "and sale of government property" at issue in Creation Upgrades, and that "Resource Conservation governs this case." See id. Therefore, neither Resource Conservation Group nor Creation Upgrades addresses the issue in the case currently before the court of a mixed-transaction contract in which the government also receives substantial services in addition to a sale of property by the government, and therefore, neither case answers whether the current mixed-transaction, sales contract is a "procurement" for the purposes of this court's jurisdiction under 28 U.S.C. § 1491(b)(1).

Defendant and defendant-intervenor also try to rely on the United States Court of Appeals for the Federal Circuit's 2016 decision in Hymas v. United States, 810 F.3d 1312, which held that the United States Court of Federal Claims did not have jurisdiction to review a disappointed bidder's protest of cooperative farming agreements (CFAs) with the United States Department of the Interior's Fish and Wildlife Service (FWS). In describing the CFAs, the Federal Circuit in Hymas stated:

> Beginning in the 1970s, the [Fish and Wildlife] Service entered into CFAs with farmers to manage public lands in the National Wildlife Refuge System for the conservation of migratory birds and wildlife, including at the Umatilla and McNary Refuges in the Pacific Northwest. Most CFAs share identical terms, through which the Service permits a "cooperator" to farm specific parcels of public land with specific crops that benefit the wildlife. No payment occurs for the performance of the CFAs; instead, cooperators typically retain 75 percent of the crop yield for their efforts. The remaining 25 percent is left to feed migratory birds and other wildlife. The Service continues its involvement once cooperators begin to perform the CFAs, advising on decisions related to (1) crop selection; (2) farming methods; (3) pesticide and fertilizer use; and (4) crop harvest.

Hymas v. United States, 810 F.3d at 1314–15 (footnote, internal citation and reference omitted). The protestor, Mr. Hymas, "through his business Dosmen Farms, sought to secure a CFA" with the Fish and Wildlife Service "in 2013 and 2014," but after the FWS considered Mr. Hymas' offers, he was not selected. Id. at 1315-16.

The Federal Circuit in Hymas found that the CFAs issued by the FWS did not constitute procurements for the purposes of the United States Court of Federal Claims' jurisdiction pursuant to 28 U.S.C. § 1491(b)(1), and, therefore, Mr. Hymas could not bring his protest in the United States Court of Federal Claims. See Hymas v. United States, 810 F.3d at 1324–30. The Hymas court "relied upon the definition of 'procurement' in 41

U.S.C. § 111," the same provision which the Federal Circuit applied in <u>Resource Conservation Group</u>. The <u>Hymas</u> court, however, also stated:

> The definition of "procurement" in 41 U.S.C. § 111 is not the only provision relevant to our inquiry, nor does a "procurement contract" encompass the entire universe of instruments at executive agencies' disposal. In 1978, Congress passed the FGCAA [Federal Grant and Cooperative Agreement Act] in light of its findings that there was "a need to distinguish [f]ederal assistance relationships from [f]ederal procurement relationships," as well as "uncertainty as to the meaning of . . . 'cooperative agreement.'" FGCAA, sec. 2, 92 Stat. at 3. In its current form, the FGCAA "prescribe[s] criteria for executive agencies in selecting appropriate legal instruments to achieve (A) uniformity in their use by executive agencies; (B) a clear definition of the relationships they reflect; and (C) a better understanding of the responsibilities of the parties to them." 31 U.S.C. § 6301(2). Congress intends the FGCAA to "eliminate unnecessary administrative requirements on recipients of Government awards by characterizing the relationship between executive agencies and contractors, States, local governments, and other recipients in acquiring property and services and in providing United States Government assistance." <u>Id.</u> § 6301(1).

<u>Hymas v. United States</u>, 810 F.3d at 1324–25 (first alteration added; ellipses in original). The <u>Hymas</u> court pointed out that the FGCAA "distinguished 'procurement contract[s] from 'cooperative agreements,'" and explained:

> In particular, the FGCAA requires that <u>"[a]n executive agency shall use a procurement contract"</u> when <u>"the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government."</u> <u>Id.</u> § 6303. By contrast, "[a]n executive agency shall use a cooperative agreement" when (1) "the principal purpose of the relationship is to transfer a thing of value" to the recipient "to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease or barter) property or services for the direct benefit or use of the United States Government" and (2) "substantial involvement" is "expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement." <u>Id.</u> § 6305.

<u>Hymas v. United States</u>, 810 F.3d at 1325 (alterations in original; emphasis added). The <u>Hymas</u> court further explained that "under the FGCAA, whether an instrument reflects a 'procurement contract' or a 'cooperative agreement' turns upon the principal purpose of the relationship." <u>Id.</u> at 1327.

Applying the provisions of the FGCAA to the cooperative farming agreements at issue in <u>Hymas</u>, the Federal Circuit stated that

if the Service principally intended to "transfer a thing of value" to the private farmers "to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit of or use of the United States Government," then the instrument is a cooperative agreement. 31 U.S.C. § 6305(1). The Service must also remain "substantial[ly] involve[d]" in the activity. Id. § 6305(2).

Hymas v. United States, 810 F.3d at 1327 (alterations in original; emphasis added). The Hymas court found that "the [Fish and Wildlife] Service properly construed the CFAs as cooperative agreements, rather than procurement contracts," and reasoned that "the Service principally intended the CFAs to transfer a thing of value (i.e., the right to farm specific refuge lands and retain a share of the crop yield) to carry out a public purpose authorized by law (i.e. to conserve wildlife on the refuges)." Id. at 1327. The Hymas court reasoned:

> The CFAs cannot be construed as procurement contracts because the agency did not intend to acquire farming "services" for the "direct benefit of use of the United States Government." 31 U.S.C. § 6305(1); see 41 U.S.C. § 111 (defining "procurement" as encompassing "all stages of the process of acquiring property or services"). True, the CFAs indirectly benefit the Service since the private farmers' activities advance the agency's overall mission, but that is true for nearly all cooperative agreements. More importantly, the Service does not directly benefit from the farming services provided pursuant to the CFAs because (1) it does not receive payment from the farmers pursuant to the agreements; and (2) "[r]efuge crop shares are all used by wildlife in the field" or retained by the farmers, such that "[t]here are no excess crops for disposition" by the Service.

Hymas v. United States 810 F.3d at 1328 (alterations in original; internal references omitted).

The bridge contract currently at issue before the court calls for the awardee to assist the United States to remove, demilitarize and mutilate an estimated total of 19,000,000 pounds of government "scrap" in the possession of the United States government. The bridge contract critically requires the awardee to remove, demilitarize and mutilate the property so as to prevent sensitive material and information from being used against United States by preventing it from falling into the wrong hands. Indeed, every pound of government property that is removed, demilitarized and mutilated by the awardee under the government's strict supervision is a pound of property on which the government need not expend its own resources to remove, demilitarize and mutilate. Only after approval by the government can what is left in its destroyed form be turned over to the contractor for subsequent sale. The removal, demilitarization and mutilation of the government property are significant and essential services needed by the government. The bridge contract at issue is unlike the CFA in Hymas, in which the principal purpose of the CFA was found by the Federal Circuit to be for the preservation of wildlife, and, as pointed out by the Federal Circuit in Hymas, the direct beneficiary was not the United

States. See Hymas v. United States, 810 F.3d at 1328 ("[T]here is no serious dispute that assisting private farmers to promote wildlife conservation is the *sine qua non* of the CFAs."). That the bridge contract currently at issue contemplates the sale and transfer of title to the government property to the contract awardee in exchange for first providing essential services to the government, as opposed to the traditional method of acquiring services through payment to the contractor, does not diminish the critical and necessary services that the government is to acquire pursuant to the bridge contract. The court in the above-captioned bid protest, No. 20-541C, finds that the acquisition of services for removal, demilitarization and mutilation of government property to be received by the government pursuant to the bridge contract are essential and critical services to the government, and are the principal purposes of the mixed-transaction contract, even under the "principal purpose" analysis applied in Hymas. See Hymas v. United States, 810 F.3d at 1327 ("[U]nder the FGCAA, whether an instrument reflects a 'procurement contract' or a 'cooperative agreement' turns upon the principal purpose of the relationship."). The mixed-transaction bridge contract currently at issue before the court, therefore, is a procurement contract sufficient to establish jurisdiction in this court under 28 U.S.C. § 1491(b)(1) to entertain protestor's bid protest.

Similarly, the "concession contracts" entered into by the United States Park Service in Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623 (2014), and Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, cited to by defendant and defendant-intervenor in this protest, are distinguishable from the current mixed-transaction contract protested by HVF. In both Jordan Pond and Eco Tour, the concession contracts involved the grant of the right to offer goods and/or services to the public in various United States national parks in exchange for paying the government a franchise fee. See Jordan Pond Co., LLC v. United States, 115 Fed. Cl. at 626 (stating that the solicitation was for a "ten-year concession contract to provide various concession services at Acadia National Park"); see also Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 11 (stating that the solicitation was for "two concession contracts to provide guided cross-country ski tours, including associated transportation and food services, in Grand Teton National Park"). In both cases, the court found that the concession contracts were not procurement contracts for the purposes of this court's jurisdiction under 28 U.S.C. § 1491(b)(1). The Judge in Eco Tour noted that that the concession contracts were "unlike traditional government procurement contracts insofar as the government does not make payments to the contractor in exchange for the provision of goods or services to the government; instead, concessioners pay the government a fee for the privilege of charging the public for services provided to the public." Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 6. The Judge in Eco Tour concluded that the "essence of NPS [National Park Service] concession contracts is not the acquisition of goods or services by the government, but the grant, for a fee, of certain rights to private contractors." Id. In Jordan Pond, the concession contract required the awardee, in addition to paying the government a franchise fee, to conduct maintenance of Acadia National Park's concession buildings where it would be providing its concession services to the public. See Jordan Pond Co., LLC v. United States, 115 Fed. Cl. at 629. The Judge in Jordan Pond noted, however, that such maintenance was "better characterized as a condition of the opportunity to operate the concession rather than as separate services provided to the Park Service."

Id. Additionally, the Judge in Jordan Pond stated that "to the extent that plaintiff argues that the concession contract in Acadia National Park is a 'mixed transaction' encompassing both a procurement of services for the government as well as a concession contract which provides funding to the Park Service, the court disagrees." Id.

As was the case with the cooperative agreements in Hymas, the Jordan Pond and Eco Tour concession contracts served a limited benefit to the government, and the principal purpose was to allow the awardee to carry out the awardee's profit-making concessions. As indicated as part of the discussion above regarding the Hymas case, in contrast, the services of removal, demilitarization and mutilation of government property in bridge contract pursuant to Solicitation No. A0008025 currently at issue before the court are critical services the government seeks to acquire, which provide significant benefits to the government, and are at the center of the contract's principal scope. Because of the substantial and critically important nature of the services to be performed directly for the benefit of the government, the court finds that the bridge contract currently under review is a mixed-transaction contract in which the services to be acquired by the government are consistent with the "principal purpose" analysis outlined in Hymas by the United States Court of Appeals for the Federal Circuit. Moreover, the extensive conditions of government-imposed restrictions attached to the bridge contract during the contract's removal, demilitarization and mutilation phases of the contract, including the detailed monitoring by the government of the awardee's removal, demilitarization and mutilation processes, and the requirement that the government must certify that all phases, including destruction, have been conducted properly before title of any property passes to the contractor, highlight the importance the government attaches to the services it is contracting for when it picks an awardee. The importance of these services to be acquired is also emphasized by the fact that government retained the right to deny the award to the apparent high bidder if the government perceived that these services of removal, demilitarization and mutilation would not be performed in a satisfactory, and responsible manner. The court, therefore, finds that this court has jurisdiction to review HVF's protest of the award of the bridge contract.

The defendant and defendant-intervenor also argue that, in the bid protest of the original contract before Chief Judge Sweeney, which preceded the issuance and subsequent protest of the bridge contract currently at issue, Chief Judge Sweeney erred by relying on a "more than de minimis" test for determining this court's jurisdiction over mixed-transaction contracts, and that this judge should not do the same. The defendant and defendant-intervenor argue that the "more than de minimis" test, which was derived from a Government Accountability Office (GAO) decision, has never been endorsed by the United States Court of Appeals for the Federal Circuit, and is otherwise inappropriate because of the differences in the jurisdictional mandate between this court and the GAO.

In Chief Judge Sweeney's decision in HVF West I, Chief Judge Sweeney found that there was jurisdiction over mixed-transaction contracts as follows:

> A procurement, for the purposes of the court's jurisdiction, is "the process of acquiring property or services." Res. Conservation Grp., 597 F.3d at

1245. The mere disposition of property, however, is not a procurement. Creation Upgrades, Inc. v. United States, 417 F. App'x 957, 959 (Fed. Cir. 2011); see also Res. Conservation Grp., 597 F.3d at 1244–45 (holding that a solicitation of bids to lease government property is not a procurement. But the court may have jurisdiction over a solicitation for a mixed transaction, which occurs when the government is seeking a contractor to buy government property and provide a service. Cf. NASA-Reconsideration, B-408823.2, 2014 CPD ¶ 147 (Comp. Gen. May 8, 2014). Specifically, the court has jurisdiction over such mixed transactions if "the agency receives a concrete tangible benefit that involves the delivery of goods and/or services to the government that are of more than a de minim[i]s value." Id.

HVF West I, 146 Fed. Cl. at 328. Chief Judge Sweeney continued in HVF West I that "the mixed-transaction analysis has two parts; the court must determine whether the agency is (1) procuring a service while attempting to sell goods/property and (2) seeking a service that has more than de minimis value to the government." Id. In HVF West I, Chief Judge Sweeney then applied the mixed-transaction analysis to the original contract, stating:

With respect to the first prong, the solicitation contemplates the awardee buying property after first providing a service: the removal and destruction of military weapons and equipment. Indeed, the awardee was required to supply that service before any sale could occur; the DLA only transferred title to the scrap materials after certifying that the awardee adequately destroyed the weapons and equipment. As to the second prong, the significant value the DLA attributed to the demilitarization and mutilation service is reflected in its detailed explanation of the requisite procedures and decision to condition any title transfer on the complete destruction of the property. This is understandable given that the dangerous or secretive nature of military equipment likely precludes the agency from disposing of the property without such processing. In short, the resulting contract is a textbook case of a mixed transaction.

Id. (footnote omitted) (alteration in original).

The "principal purpose" analysis articulated in Hymas and which the undersigned has found above is met by the mixed-transaction contract pursuant to Solicitation No. A0008025 currently under review, is even more stringent than the "more than de minimis" test embraced by Chief Judge Sweeney. Both the earlier contract reviewed by Chief Judge Sweeney and the bridge contract currently under review required the contractor to remove, demilitarize and mutilate government property under strict conditions and required certification "before any sale could occur," given the "dangerous or secretive nature" of the equipment to be destroyed. See HVF West I, 146 Fed. Cl. at 328. Although neither of the parties, nor the court, have identified a decision by the United States Court of Appeals for the Federal Circuit which articulates a specific test to determine whether a mixed-transaction contract qualifies as a procurement contract for the purposes of this

court's jurisdiction, the undersigned concludes that the sensitive nature and significance of the services to be provided to the government pursuant to the mixed-transaction bridge contract currently at issue satisfies both the "principal purpose" test outlined in Hymas, or the more relaxed, "more than de minimis" test outlined in HVF West I. In conclusion, the court finds that the mixed-transaction bridge contract before the court constitutes a procurement for purposes of this court's bid protest jurisdiction pursuant to 28 U.S.C. § 1491(b)(1). The court also notes that conferring jurisdiction in this court over mixed-transaction contracts such as the bridge contract currently at issue, which involves significant services to the benefit of the government, comports with the goals outlined in the legislative history leading up to the enactment of 28 U.S.C. § 1491(b)(1). As described in Resource Conservation Group, the United States Court of Appeals for the Federal Circuit stated:

> The legislative history of the ADRA indicates that the enactment [of] § 1491(b)(1) was motivated by a concern with forum shopping and fragmentation of government contract law. As the original sponsor of the jurisdictional provision (Senator Cohen) stated, "It is my belief that having multiple judicial bodies review bid protests of Federal contracts has resulted in forum shopping as litigants search for the most favorable forum. Additionally, the resulting disparate bodies of law between the circuits has created a situation where there is no national uniformity in resolving these disputes." See 142 Cong. Rec. S11848 (daily ed. Sept. 30, 1996) (statement of Sen. Cohen).

Res. Conservation Grp., 597 F.3d at 1242–43. The services that are required to be performed in the contract at issue in the above-captioned protest, i.e., the removal, demilitarization and mutilation of an estimated total of 19,000,000 pounds of government property, are services for which the United States would otherwise have to expend significant financial resources to accomplish. In the bridge contract now under review, acquisition of the services to the benefit of the government were combined with the passage of title to the contractor in exchange for the services performed for the government, whether calling it a "barter," or a "sales" or mixed-transaction" contract, with title ultimately passed to the contractor, but only after the required, supervised services are performed. The principal purpose of the contract is for the removal, demilitarization and mutilation of no longer useful, sensitive government property. In this mixed-transaction contract, the nature and extent of the services which the United States is to receive in connection with the contract determines that the contract is a "procurement" for purposes of this court's jurisdiction pursuant to 28 U.S.C. § 1491(b)(1). Therefore, this court finds this court has subject-matter jurisdiction over the protestor's protest.

DLA DS' Non-Responsibility Determination of HVF's Proposed Site

In protestor's motion for judgment on the administrative record, protestor argues that DLA DS "fail[ed] to consider important evidence before the agency" when DLA DS determined that HVF was a non-responsible bidder, and that the agency's actions constituted "arbitrary and capricious decision-making." Protestor also asserts that there

was disparity in DLA DS' treatment of HVF when finding that HVF was a non-responsible bidder in contrast to how DLA DS later treated defendant-intervenor, Lamb, when finding that Lamb was a responsible bidder and eligible to be awarded the bridge contract. Protestor alleges that "DLA DS engaged in unequal treatment" when DLA DS: (1) "extrapolated from the test results of samples taken at HVF's facility to find a 'probable' violation, but concluded there was no issue as to substantially similar test results of samples taken at Lamb's facility," (2) "assumed that HVF would not remove tires before the requested deadline, but then assumed that Lamb would receive all requisite permits before performance," and (3) "labeled HVF as uncooperative for not allowing the agency to take photographs, but declined to criticize Lamb for managing the photographs of its facility." (capitalization and emphasis omitted). In defendant's and defendant-intervenor's cross-motions for judgment on the administrative record, defendant and defendant-intervenor argue that DLA DS treated both HVF and Lamb appropriately and that there is no merit to HVF's criticisms of DLA DS' non-responsibility determination of HVF. Defendant and defendant-intervenor also moved to dismiss the protest, arguing that protestor lacks standing to challenge the award to Lamb. Protestor responds, however, that it "is not challenging the award to Lamb. Rather, HVF is arguing that DLA DS applied arbitrary standards *when it evaluated HVF* — and that the arbitrariness of those standards is made clear by the different standards DLA DS applied to Lamb." (emphasis in original).

As discussed above, the Tucker Act, as amended by the ADRA, grants the United States Court of Federal Claims "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In order to have standing to sue as an "interested party," a disappointed bidder must show that it suffered competitive injury or was "prejudiced" by the alleged error in the procurement process. In describing the prejudice requirement, the Federal Circuit has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'" (citation omitted)).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d

901, 912 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011) (To prevail, a bid protester must first "'show that it was prejudiced by a significant error' (i.e., 'that but for the error, it would have had a substantial chance of securing the contract.'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378, 1380 (Fed. Cir. 2009)); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1317 (Fed. Cir. 2007); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057 (Fed. Cir.), reh'g denied (Fed. Cir. 2000); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000); CR/ZWS LLC v. United States, 138 Fed. Cl. 212, 222 (2018) ("In post-award protests, like this one, a plaintiff may demonstrate competitive injury or prejudice by showing that it would have had a "substantial chance" of winning the award "but for the alleged error in the procurement process." (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1359)); Sci. Applications Int'l Corp. v. United States, 108 Fed. Cl. 235, 281 (2012); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 693 (2010) ("In order to establish standing to sue, the plaintiff in a bid protest has always needed to demonstrate that it suffered competitive injury, or 'prejudice,' as a result of the allegedly unlawful agency decisions." (citing Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006); Statistica, Inc. v. Christopher, 102 F.3d at 1580–81; Vulcan Eng'g Co. v. United States, 16 Cl. Ct. 84, 88 (1988); Morgan Bus. Assocs., Inc. v. United States, 223 Ct. Cl. 325, 332 (1980))). In order to establish what one Judge on this court has called "allegational prejudice" for the purposes of standing, the bidder must show that there was a "substantial chance" it would have received the contract award, but for the alleged procurement error. See Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 675; Hyperion, Inc. v. United States, 115 Fed. Cl. 541, 550 (2014) ("The government acknowledges that proving prejudice for purposes of standing merely requires "allegational prejudice," as contrasted to prejudice on the merits . . . ."); Bannum, Inc. v. United States, 115 Fed. Cl. 148, 153 (2014); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1358 (Fed. Cir. 2005); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1331 (Fed. Cir.), reh'g denied (Fed. Cir. 2004); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Statistica, Inc. v. Christopher, 102 F.3d at 1581; Archura LLC v. United States, 112 Fed. Cl. 487, 497 (2013); Lab. Corp. of Am. V. United States, 108 Fed. Cl. 549, 557 (2012). Because standing is a jurisdictional issue, this showing of prejudice is a threshold issue. See Corus Grp. PLC. V. Int'l Trade Comm'n, 352 F.3d 1351, 1357 (Fed. Cir. 2003); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002).

As described above, HVF submitted the highest purchase price in response to the bridge contract Solicitation, No. A0008025, for the removal, demilitarization, mutilation, and then sale of government property. After the close of bids, DLA DS contacted HVF, informing HVF that it was the "apparent high bidder." In accordance with the Solicitation, HVF submitted the required documentation to DLA DS, and the agency began to conduct reviews of the HVF facility in Tucson, Arizona where HVF proposed that it would be

performing the removal, demilitarization and mutilation of the government property. In accordance with the bridge contract Solicitation, DLA DS' pre-award activities included conducting an environmental responsibility determination of the HVF facility. DLA DS engaged in a number of communications with HVF and conducted site visits to the HVF facility. In addition to DLA DS' communications and site visits, the State of Arizona agency, ADEQ, also conducted a site visit of HVF's facility in response to an anonymous complaint, and communicated with DLA DS regarding their findings on HVF. After the reviews of the site proposed by HVF for the performance of the bridge contract were conducted, HVF was determined to be environmentally non-responsible in DLA DS' Tim Cronk's Final Environmental Responsibility Determination of HVF, completed on March 12, 2020. DLA DS did not begin to review defendant-intervenor, Lamb, for the award of the bridge contract until after HVF was eliminated from the competition due to HVF's non-responsibility determination by DLA DS.

In the bid protest of the bridge contract currently before the court, protestor HVF alleges that DLA DS acted arbitrarily and capriciously when finding HVF non-responsible and declining to award the bridge contract to HVF. HVF disputes the reasonableness of the decision in DLA DS' Final Environmental Responsibility Determination on HVF, written by Mr. Cronk of DLA DS' Environmental Office, recommending to the Sales Contracting Officer that HVF not be awarded the bridge contract. The parties do not argue that protestor was otherwise ineligible for the award of the bridge contract at issue. Because HVF was the highest bidder, and because no other allegations of insufficiency are before the court, the record suggests that there was a substantial chance that, in accordance with the bridge contract Solicitation, DLA DS would not have gone on to consider Lamb for the award of the bridge contract had the agency found HVF to be environmentally responsible. Therefore, regarding the issue of protestor's standing, protestor has sufficiently established that it had a direct economic interest, and therefore, protestor has standing to bring this protest.[6]

---

[6] The court notes that for the original contract protested by HVF in HVF West I, Chief Judge Sweeney also found that HVF had standing, however, the circumstances regarding the standing analysis in HVF West I are not wholly comparable to the current bid protest. In HVF West I, HVF was the fourth-highest bidder for the original contract, and HVF was protesting the award to the apparent high bidder, Lamb. Nevertheless, in HVF West I, the court found that protestor had standing because HVF had alleged that "the SCO [Sales Contracting Officer] erred by failing to evaluate each bidder's nonprice factors—the technical information—and then failing to award contracts to the most advantageous bidders based on its review of those factors and the bids." HVF West I, 146 Fed. Cl. at 330. In HVF West I, protestor further asserted that its "nonprice attributes—it is the incumbent and is located next to Davis-Monthan Air Force Base— are so strong that the SCO could rationally conclude that HVF is one of the most advantageous bidders." Id. The HVF West I court found that "HVF, therefore, is a bidder with the requisite direct economic interest because it has alleged it could compete for an award but for the SCO's purported failure to follow the solicitation's evaluation process," and that "HVF has established the prejudice element of standing by demonstrating a direct economic interest in the procurement." Id. (citing CliniComp Int'l, Inc. v. United States, 904 F.3d 1353, 1358 (Fed. Cir. 2018).

As discussed above, in protestor's motion for judgment on the administrative record, protestor argues that DLA DS "failed to consider important evidence before the agency" when DLA DS determined that HVF was a non-responsible bidder, and that the agency, therefore, engaged in "arbitrary and capricious decision-making." Protestor also argues that it was treated unfairly, arbitrarily and capriciously due to the alleged disparity in treatment of HVF by DLA DS in contrast to how DLA DS subsequently treated Lamb, after HVF was eliminated from consideration, finding that Lamb was a responsible bidder and ultimately leading to the award of the bridge contract to Lamb.

Rule 52.1(c)(1) (2020) of the Rules of the United States Court of Federal Claims (RCFC) addresses motions for judgment on the administrative record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d at 1356-57)); see also Centerra Grp., LLC v. United States, 138 Fed. Cl. 407, 412 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1356-57); Informatics Applications Grp., Inc. v. United States, 132 Fed. Cl. 519, 524 (2017) (citation omitted); Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016), aff'd, 711 F. App'x 651 (Fed. Cir. 2018); Rotech Healthcare Inc. v. United States, 118 Fed. Cl. 408, 413 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 21; DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010). Pursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013); see also CR/ZWS LLC v. United States, 138 Fed. Cl. at 223 (citing Bannum, Inc. v. United States, 404 F.3d at 1353-54).

As discussed above, the ADRA amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1330-32; see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests). The statute provides that protests of agency procurement decisions are to be reviewed under APA standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'" (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) (citing PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010))); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332; Res. Conservation Grp., LLC v. United States, 597 F.3d at 1242 ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v.

Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1329 (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319.

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir.) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (alterations in original) (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350-51 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057-58))), reh'g and reh'g en banc denied (Fed. Cir. 2013). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2018);[7] see also Veterans Contracting Grp., Inc. v. United States, 920

---

[7] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;

F.3d 801, 806 (Fed. Cir. 2019) ("In a bid protest, we follow Administrative Procedure Act § 706 and set aside agency action 'if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting Palladian Partners, Inc. v. United States, 783 F.3d at 1252), cert. denied, 140 S. Ct. 854 (2020); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); and Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d at 1358; Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381 (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1312 ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000)." (internal citations omitted)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Synergy Sols., Inc. v. United States, 133 Fed. Cl. 716, 734 (2017) (citing Banknote Corp. of Am. v. United States, 365 F.3d at 1350); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334,

---

    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    (D) without observance of procedure required by law;

    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d at 1351), reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure." (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285-86)); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907; McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531-32 ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)), subsequent determination, 96 Fed. Cl. 119 (2010).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285-86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Dell Fed. Sys., L.P. v. United

States, 906 F.3d 982, 990 (Fed. Cir. 2018); Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)); Synergy Sols., Inc. v. United States, 133 Fed. Cl. at 735 (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33). """If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Limco Airepair, Inc. v. United States, 130 Fed. Cl. 544, 550 (2017) (citation omitted); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. at 631; Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (internal citations omitted), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); By Light Prof'l IT Servs., Inc. v. United States, 131 Fed. Cl. 358, 366 (2017); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (internal citations omitted) (quoting Keeton Corrs., Inc. v.

United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004); and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal dismissed, 559 F. App'x 1033 (Fed. Cir. 2014); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. at 382; Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002).

> According to the United States Court of Appeals for the Federal Circuit:
>
> Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958-59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Furthermore, according to the United States Court of Appeals for the Federal Circuit:

> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also AgustaWestland N. Am., Inc. v. United States, 880 F.3d at 1332 ("Where, as here, a bid protester challenges the procurement official's decision as lacking a rational basis, we must determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,' recognizing that 'contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33 (internal

quotation marks and citation omitted))); <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke [ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (alteration in original) (quoting <u>CHE Consulting, Inc. v. United States</u>, 552 F.3d at 1354 (quoting <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d at 1058))).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. <u>See</u> <u>Tinton Fall Lodging Realty, LLC v. United Sates</u>, 800 F.3d at 1364; <u>see</u> <u>also</u> <u>Grumman Data Sys. Corp. v. Dalton</u>, 88 F.3d at 995-96; <u>Enhanced Veterans Sols., Inc. v. United States</u>, 131 Fed. Cl. 565, 578 (2017); <u>Davis Boat Works, Inc. v. United States</u>, 111 Fed. Cl. at 349; <u>Contracting, Consulting, Eng'g LLC v. United States</u>, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." <u>PAI Corp. v. United States</u>, 614 F.3d at 1352 (citing <u>John C. Grimberg Co. v. United States</u>, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); <u>see also</u> <u>Turner Constr. Co., Inc. v. United States</u>, 645 F.3d at 1387; <u>Sierra Nevada Corp. v. United States</u>, 107 Fed. Cl. 735, 759 (2012); <u>Filtration Dev. Co., LLC v. United States</u>, 60 Fed. Cl. 371, 380 (2004).

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

<u>Bannum, Inc. v. United States</u>, 404 F.3d at 1351; <u>T Square Logistics Servs. Corp. v. United States</u>, 134 Fed. Cl. 550, 555 (2017); <u>FirstLine Transp. Sec., Inc. v. United States</u>, 119 Fed. Cl. 116, 126 (2014), <u>appeal dismissed</u> (Fed. Cir. 2015); <u>Eco Tour Adventures, Inc. v. United States</u>, 114 Fed. Cl. at 22; <u>Archura LLC v. United States</u>, 112 Fed. Cl. at 496. To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. <u>See</u> 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); <u>see also</u> <u>Glenn Def. Marine (ASIA), PTE Ltd. v. United States</u>, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."); <u>IT Enter. Sols. JV, LLC v. United States</u>, 132 Fed. Cl. 158, 173 (2017) (citing <u>Bannum v. United States</u>, 404 F.3d at 1357-58); <u>Linc Gov't Servs., LLC v. United States</u>, 96 Fed. Cl. at 694-96.

In the above-captioned protest, the parties dispute the reasonableness of DLA DS' decision to find HVF non-responsible. In the Final Environmental Responsibility

Determination on HVF, DLA DS' Tim Cronk recommended to the Sales Contracting Officer that HVF should not be considered for the award the bridge contract. Mr. Cronk stated in his Final Environmental Responsibility Determination regarding HVF that "[t]wo primary issues among others contributed to the 'Not recommended' as a result of the ERD [Environmental Responsibility Determination]." (capitalization in original). The significant concerns raised in Mr. Cronk's Final Environmental Responsibility Determination on HVF relate to HVF's handling of hazardous and solid waste, as documented by both DLA DS and ADEQ inspectors during their various visits to HVF's proposed site for contract performance. In addition, Tim Cronk's Final Environmental Responsibility Determination on HVF also discusses multiple occurrences in which HVF was less than forthcoming with DLA DS and ADEQ with respect to providing information upon request, which included, but was not limited to, when HVF prohibited DLA DS from taking pictures on HVF's proposed site for contract performance.

With regard to HVF's handling of hazardous waste, Mr. Cronk's Final Environmental Responsibility Determination on HVF stated that "[t]he first issue that raised concern was outlined in the Arizona Department of Environmental Quality Hazardous Waste Inspection Report dated 1-15-2020." On January 15, 2020, ADEQ conducted a hazardous waste inspection of HVF's proposed site for contract performance in response to an anonymous complaint ADEQ had received. ADEQ inspector Jenna Brickner documented in her Hazardous Waste Inspection Report for the January 15, 2020 ADEQ visit to HVF that she "observed multiple piles of assorted military scrap metal," some of which "were placed directly on soil," and also observed "painted aircraft parts and paint chips throughout the property, on and off the paved areas." Anthony Stone, who conducted ADEQ's solid waste inspection of HVF, noted similar observations in his Solid Waste Field Inspection Report, stating that he "observed that HVF West had not created sufficient measures to reduce the potential of soil contamination from their recycling activities," and that "[c]oncrete had been installed on a large portion of the outdoor facility yard located around the processing building; however, the majority of the material on-site appeared to be sitting directly on bare soil." Identifying a "pile of painted aircraft parts that appeared to contain more painted pieces than other piles," and that the paint was a "lime green color which is distinctive of aircraft paint containing chromium and/or cadmium," Jenna Brickner retrieved soil samples from HVF's proposed site. The first sample was retrieved from the base of one of the piles, and the second was retrieved "downgradient" of the pile, in the natural direction of where groundwater would flow from the pile. After giving a portion of each sample to HVF, ADEQ sent its portion of the samples to Eurofins TestAmerica, a "third party registered environmental lab for analysis." Jenna Brickner documented in her hazardous waste inspection report that the levels of cadmium in the two soil samples, tested for by Toxicity Characteristic Leaching Procedure (TCLP), were 4.2mg/L and 4.9 mg/L, respectively.

Mr. Cronk, who wrote DLA DS' Final Environmental Responsibility Determination on HVF stated that the levels of cadmium by TCLP "far exceed[ed]" the limit set forth in the federal regulation at 40 C.F.R. § 261.24 (2019), and that "a review of HVF West's records did not indicate they were authorized nor permitted by the Environmental Protection Agency nor the state of Arizona to Transfer, Store, or Dispose of Hazardous Waste." (capitalization in original). The federal regulation at 40 C.F.R. § 261.24 provides

that a sample that includes a cadmium level greater than 1.0 mg/L, taken by Toxicity Characteristic Leaching Procedure, is considered "hazardous," and, therefore, the soil samples taken by ADEQ, which contained cadmium levels of 4.2 mg/L and 4.9 mg/L, respectively, met the "hazardous" threshold. The regulation in the Arizona Administrative Code at § 18-8-270(B)(1) requires, in relevant part, that "the treatment, storage, or disposal of any hazardous waste is prohibited except . . . [u]nder the conditions of a permit." ARIZ. ADMIN. CODE § 18-8-270 (2020). The record before the court indicates that HVF did not hold a permit to treat, store, or dispose of hazardous waste, and, therefore, because the levels of cadmium found in the soil at HVF's proposed site for contract performance were considered "hazardous," as defined by the federal regulation, above, HVF appears to have been in violation of the Arizona Administrative Code. This violation also was noted in ADEQ inspector Ms. Brickner's Hazardous Waste Inspection Report, which stated that "[t]he sample results indicate that the facility is storing and disposing hazardous waste without a permit. [sic] consequently disposing its hazardous waste directly into the environment. These actions are violations pursuant to A.A.C. R18-8-270(B)(1)." Ms. Brickner also stated in a March 2, 2020 phone call with Mr. Cronk that ADEQ intended to issue a Notice of Violation to HVF regarding the levels of cadmium found in the soil samples. She also informed Mr. Cronk in the March 2, 2020 phone call that HVF had agreed to join ADEQ's Voluntary Remediation Program, and that ADEQ planned to work with HVF regarding the remediation of the soil.

ADEQ also had the soil samples tested for chromium, in addition to cadmium. Unlike for cadmium, which, as noted above, was tested using a TCLP, measured in mg/L, the chromium levels were tested using a total metals analysis, measured in mg/kg. Tim Cronk's Final Environmental Responsibility Determination on HVF states that "[t]he results for the sample located at the base of the pile (sample 1), were 1100mg/kg for total Chromium. The results for the sample from the soil downgradient of the pile (sample 2), were 480 mg/kg for total Chromium." The federal regulation at 40 C.F.R. § 261.24, however, only provides the "hazardous" threshold for metals tested using a TCLP. Therefore, the results of the chromium tested in the soil samples could not be used directly to determine whether the level of chromium in the soil met the "hazardous" threshold defined by the federal regulation at 40 C.F.R. § 261.24. Tim Cronk's "Final Environmental Determination" for HVF stated that results of the chromium in the soil "indicate the probability of a level of Chromium significantly greater than the regulatory level. However, without a TCLP result, the Chromium level report was considered in the decision to not recommend HVF West but not as a regulatory violation as with the Cadmium."

Protestor in the above-captioned protest argues that DLA DS allegedly failed to take into consideration the results of the soil samples which HVF had sent independently for testing, as those results were not addressed in DLA DS' reasoning for finding HVF non-responsible and declining to award the bridge contract to HVF. As discussed above, during ADEQ's January 15, 2020 inspection of HVF's proposed site for contract performance, ADEQ had split the two soil samples it had taken with HVF. HVF subsequently sent its portion of the samples for independent testing to Legend Technical Services, Inc. On February 19, 2020, HVF emailed DLA DS the results of the tests. The

levels of cadmium in both of the soil samples were tested for by using a Toxicity Characteristic Leaching Procedure as well as a total metals analysis. The soil samples were also tested for chromium using only a total metals analysis.

Protestor ignores that, with regard to the cadmium levels found using a TCLP test, HVF's independent results were 3.9 mg/L in each soil sample, and, therefore, like ADEQ's test for cadmium at HVF's proposed site, HVF's independent test for cadmium also exceeded the "hazardous" level as defined in the federal regulation at 40 C.F.R. § 261.24. Protestor, however, focuses on the levels of cadmium and chromium found in its independent testing that were tested for using a total metals analysis, and asserts that the levels found from its independent testing of the soil samples were "substantially below the non-residential level established under Arizona Administrative Code section 18-7-205." The fact that protestor's independent results may have indicated levels below the regulatory limit for cadmium and chromium under a total metals analysis, however, does not negate HVF's requirement to have a permit for hazardous waste due to the levels of cadmium found in the soil using a TCLP test, which exceeded the federal definition constituting "hazardous" waste. Nor do the levels of chromium found by HVF's independent testing work to assuage DLA DS' legitimate concerns about entering into a contract for removal and destruction of metals with the potential to cause significant soil and groundwater contamination if not handled appropriately, with a company which was about to be cited with a Notice of Violation by Arizona state regulators for its handling of hazardous waste, and was only in the process of remediating the toxicity levels in its soil. Moreover, although Mr. Cronk did not discuss HVF's independent testing of the soil samples in his Final Environmental Responsibility Determination on HVF, DLA DS was under no obligation to consider HVF's independent test results, nor was DLA DS under any obligation to weigh HVF's independent test results against the test results DLA DS received from ADEQ, the state regulatory agency. In this respect, DLA DS did not act unreasonably in its evaluation of the hazardous waste found at HVF's proposed site for contract performance, and on how the agency assessed the risk of an award to HVF.

Mr. Cronk stated in his Final Environmental Responsibility Determination on HVF that the "second of two issues that caused DLA Disposition Services concern and resulted in our submission of a 'not recommended' in our report," was related to the "issue noted by the ADEQ regarding solid waste." As discussed above, in addition to the hazardous waste inspection conducted by Ms. Brickner of ADEQ on January 15, 2020, ADEQ also conducted a solid waste inspection of HVF's proposed site on the same day, which inspection was conducted by ADEQ inspector, Anthony Stone. As a result of his inspection, Mr. Stone cited HVF for the violation of the regulation at A.A.C. R18-13-303(A), which states that "[n]o person shall place, deposit, or allow to be placed or deposited on his premises or on any public street, road, or alley any refuse or other objectionable waste, except in a manner described by these rules." ARIZ. ADMIN. CODE. § 18-13-303(A) (2020). Mr. Stone's inspection report also stated, under the heading: "Notice of Opportunity to Correct Deficiencies," (capitalization and emphasis omitted), that "[w]ithin 90 calendar days of the date of this notice; please submit documentation to the ADEQ contact above demonstrating that no violation has occurred or documentation that the alleged deficiency has been corrected." (emphasis in original). Mr. Cronk's Final

Environmental Responsibility Determination regarding HVF stated that "it would not be prudent to issue material to this company given they had just been cited by the regulating authority in Arizona for . . . a solid waste violation that is still within the remedy time frame (90 days)." Mr. Cronk's Final Environmental Responsibility Determination on HVF's site also stated that when he called Anthony Stone regarding Mr. Stone's solid waste inspection of HVF's site, "Mr. Stone stated that the amount of tires and the number of violations he noted at HVF West caused him to issue a single Solid Waste violation for improper tire storage instead of individual citations for each violation."

Protestor in the above-captioned protest argues that DLA DS unfairly penalized HVF due to its storage of tires because HVF only stored "off road" tires, namely, aircraft tires, which, according to protestor, are "not subject to Arizona tire collection site regulations." Protestor also argues that DLA DS failed to consider that HVF was actively in the process of removing the tires on-site, pursuant to Anthony Stone of ADEQ's citation issued to HVF. Regarding protestor's argument that HVF is "not subject to Arizona tire collection site regulations," protestor appears to be referring to the exemptions afforded to sites which collect "off road motor vehicle" tires, as opposed to "motor vehicle tires," pursuant to the regulations derived from Title 44 of the Arizona Revised Statues (A.R.S.). See Ariz. Rev. Stat. Ann. § 44-1301 (2020) (defining "Motor vehicle" separately from "Off road motor vehicle," and including "airplanes" in the definition of "Off road motor vehicle"). The statute at A.R.S. § 44-1304.04(A) states:

A. It is unlawful to store one hundred or more used <u>motor vehicle</u> tires outdoors as follows:

1. In any fashion that exceeds twenty feet in height.

2. In a pile that is more than one hundred fifty feet from a twenty foot wide access route that allows fire control apparatus to approach the pile. . . . .

3. Within three feet of any property line.

4. In any fashion that exceeds six feet in height if the used tires are stored between three and ten feet of any property line.

5. Within fifty feet of any area in which smoking of tobacco or any other substance by persons is permitted. "No smoking" signs shall be posted in suitable and conspicuous locations.

6. At any area in which the used motor vehicle tires are stored and in which electrical wiring, fixtures or appliances do not comply with the national electrical code.

7. Without placing class "2A-10BC" type fire extinguishers at well marked points throughout the storage area so that the travel distance from any point in the storage area to a fire extinguisher is not more than seventy-five feet.

8. Without prior registration of the site with the department of environmental quality. . . .

Id. (emphasis added). It appears, therefore, that collection sites which only store "off road motor vehicle" tires do not need to comply with the above requirements because only "motor vehicle" tires, and not "off road motor vehicle" tires, are mentioned in the statute. Mr. Cronk's Final Environmental Responsibility Determination on HVF, however, makes no mention of the requirements listed in A.R.S. § 44-1304.01(A), nor did he include in his Final Environmental Responsibility Determination on HVF, any conclusion with regard to whether HVF was required to comply, or failed to comply, with the above-listed requirements. The Arizona statute at A.R.S. § 44-1304.01 is separate from the regulation at A.A.C. R18-13-303, the Arizona regulation that Mr. Stone cited HVF with a violation of, and which citation is discussed in Mr. Cronk's Final Environmental Responsibility Determination on HVF. This regulation at A.A.C. R18-13-303 applies equally to both motor vehicle tire collection sites, as well as off-road motor vehicle tire collection sites, and thus HVF was not exempt from complying.

There also were instances in DLA DS' and ADEQ's reviews of the HVF site that HVF was less than immediately forthcoming with information related to HVF's tire disposal and metal processing procedures. With regard to the disposal methods of the tires on site, the Final Environmental Responsibility Determination on HVF stated that in a follow-up call made by Mr. Cronk to Mr. Stone,

> Mr. Stone indicated that HVF West was allusive [sic] and evasive in their responses to his questions. Mr. Stone also stated that when HVF West was asked certain questions regarding their processes and procedures for disposing of tires, they stated that the information regarding the tires was "proprietary" and they would not answer.

With regard to HVF's metal processing, ADEQ's Mr. Stone's Solid Waste Field Inspection Report stated that when speaking to HVF vice president Scott Laughlin during his solid waste inspection,

> Mr. Laughlin stated that HVF West is a metal recycling facility that is paid by the U.S. Military to shred military aircraft and other items. The shredded material is sorted to remove the ferrous and non-ferrous metals for recycling. According to Mr. Laughlin, the metal processing is conducted on an as-needed basis once the product arrives. Mr. Laughlin stated that he was not allowed to provide information about the specifics of the process, material being processed, when material was received, when material will be sent out, origin of the material, or where the material will be will be [sic] sent.

Mr. Stone of ADEQ was not the only inspector of HVF's proposed site for contract performance to take note of the large piles of property on-site, and HVF's unwillingness

to provide information with regard to HVF's handling of solid waste. In DLA DS inspector Lisa Henninger's pre-award survey at HVF's proposed site, which survey was discussed in Tim Cronk's Final Environmental Responsibility Determination on HVF, Ms. Henninger documented that she had "observed scrap property stored on the soil and several large mounds of processed residue that was identified as a commodity by HVF West representatives" and that the mounds "appeared to have been stored for a long period of time and would be estimated at 150 tons of residue property." Lisa Henninger also stated in her February 3, 2020 pre-award survey documentation that she

> asked HVF West representatives how the commodity was disposed of which they answered, the process was propriety [sic]. I continued by asking what type of facility they use and when the last time a shipment was sent out however the representatives could not provide any answers. My observation is the mounds of property have been at the HVF West location for several years. Without any documentation or guidance on the disposal process I cannot verify that the property is being disposed of in accordance with regulations.

Ms. Henninger also documented that there were "[o]ver 500 Tires observed on site," and that "tires were store [sic] at multiple locations through the yard." (capitalization in original).[8]

---

[8] The Final Environmental Responsibility Determination on HVF also discussed an email received by DLA DS from Greg Lamb, president of Lamb, the contract awardee and defendant-intervenor in this protest, listing numerous violations which he suspected might be occurring on HVF's proposed site for contract performance, and attaching historical Google images of the property build-up at the HVF site. Mr. Lamb's email was sent during DLA DS' consideration of HVF for award of the bridge contract before DLA DS' eliminated HVF, which was also before DLA DS had begun to consider Lamb for the award. With regard to Mr. Lamb's email, the "Final Responsibility Determination" states:

> On January 27, 2020, DLA received an email from Greg Lamb regarding issues at the Apparent High Bidders [sic] facility (HVF West's facility). Included in his email were several claims of regulatory violations regarding "potential accumulation of solid waste in the form of tires . . .," "solid waste permit violations and the lack of a special waste permit," "Automobile Shredder Residue accumulation violations," and "several piles of Dirt and Dirt w/solid waste may be on site." Included in the email were several Google Map satellite photos of HVF West's facility stating they were from 2014 through 2018. The photos clearly represented large piles of tires throughout the property. DLA Disposition Services Environmental Office then researched and retrieved Google Map Satellite photos of the same location at HVF West dated February 2020 showing tires in the same locations throughout the property. Some of the piles had grown in size and there appeared to be additional tires located throughout the property that were either in fewer numbers or not there at all in the 2014 Google satellite

In addition to the identification of HVF employees exhibiting reluctance to provide information during the site visits of the proposed HVF site, the Final Environmental Responsibility Determination on HVF noted the limitations that HVF imposed on DLA DS with regard to taking pictures at HVF's proposed site. The Final Environmental Responsibility Determination states:

> On March 2, 2020 DLA Disposition Services Environmental Office contacted our DLA Representative Mr. David Powell from the Tucson, AZ office regarding his site visit. The subject of the conversation was the lack of photos provided by his team during the visit. Mr. Powell stated he began to take photos of the area where DLA Disposition Services property would be processed by HVF West. He then stated that a representative from the HVF West team accompanying him during the tour of the property called and [sic] HVF West attorney and asked if photos should be allowed as part of the tour. The representative then asked Mr. Powell to cease taking photos and asked him to delete the photos he had already taken. To ensure Mr. Powell deleted the photos, the representative visually observed Mr. Powell delete the photos. This gave concern to our team that HVF West was not fully cooperating with DLA in accordance with the Invitation for Bid (A0008025) which states "the apparent high bidder shall cooperate fully with the Government when informed by the Agency of an ongoing investigation by any DOD or Federal Government Investigation service or agency or during the Agency's Compliance Reviews or Audits."

Based on the totality of the record before the court, DLA DS was not unreasonable to be concerned about the outstanding adverse environmental circumstances presented during DLA DS' and ADEQ's reviews of HVF's proposed site. These included piles of property with green paint indicating excessive levels of cadmium and chromium with the potential to cause contamination of groundwater, further prompting the impending Notice of Violation resulting from ADEQ's hazardous waste inspection. In addition, there was a violation cited to HVF with regard to HVF's handling of solid waste, pursuant to A.A.C. R18-13-303, and uncertainty related to the nature, age, and removal processes of the large piles of potential solid waste on site. The adverse conditions raised concern given the multiple accounts of HVF's hesitance to respond to questions in real-time regarding

---

photo. These photos were used to verify the large piles of tires on the property and confirm ADEQs report of accumulating solid waste on the premises.

To the extent that protestor argues that DLA DS improperly relied on the information and images received through the Lamb email when finding HVF non-responsible and declining to award the bridge contract to HVF, protestor's argument fails. Although one might question Lamb's motive as a competitor of HVF for the bridge contract, DLA DS had collected sufficient evidence on its own as a result of site visits and the findings by ADEQ, the Arizona state regulatory agency, to support DLA DS' conclusions regarding the concerning conditions at HVF's site.

HVF's storage and disposal methods for solid waste, and HVF's insistence that HVF be the one to take and submit any photographs. These circumstances were documented by the DLA DS and ADEQ personnel who conducted the site inspections of HVF's proposed site for contract performance, and the documentation formed the basis of Tim Cronk's conclusion in his "Final Environmental Responsibility Determination" that HVF should be found non-responsible, and to recommend to the Contracting Officer that the government not award the bridge contract to HVF. The court also notes that DLA DS had every financial reason to want to award the contract to HVF, given that their price was almost double the second-highest purchase price of defendant-intervenor, Lamb.

As stated in the bridge contract solicitation currently at issue, "[a]ll offerors are advised that they must comply with all applicable Federal, State and local laws, ordinances, regulations, etc. with respect to human safety and the environment during the processing, use, or disposal of material purchased from the Department of Defense." The bridge contract solicitation at issue also states, pursuant to 41 C.F.R. § 102-38.205, that DLA DS "may reject any or all bids when such action is advantageous to the Government, or when it is in the public interest to do so." Id. DLA DS was under no obligation to wait to award the contract in order to allow HVF to come into compliance with ADEQ's citations, or otherwise provide HVF with the opportunity to alleviate DLA DS' concerns borne out of the documented accounts of various inspectors of HVF's handling of hazardous and solid waste on its proposed site. The scope of work required by the bridge contract called for the contractor to be responsible for carrying out large-scale destruction of metals, on the order of 19,000,000 pounds, which, if not conducted properly, had the potential of contaminating the groundwater, possibly putting the public at risk, and which could have resulted in the government's potential liability. Therefore, it was not inconsistent with the government's best interests to have declined to award to HVF based on the noted adverse environmental conditions at HVF's proposed site which were present during DLA DS' consideration of HVF for the award. As stated above, "[t]he arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058; see also BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. at 508 ("The court is not empowered to substitute its judgment for that of the agency, and it must uphold an agency's decision against a challenge if the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." (internal citations and quotation marks omitted); PAI Corp. v. United States, 614 F.3d at 1351 ("Contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process. Accordingly, procurement decisions are subject to a highly deferential rational basis review." (internal citations and quotation marks omitted)). Therefore, the court finds that, based on the record before the court, HVF has not met its burden to establish that DLA DS acted unreasonably, arbitrarily or capriciously when it found HVF non-responsible.

The court also notes that protestor in the above-captioned bid protest puts forth numerous arguments which relate to the alleged disparity in DLA DS' treatment of HVF when DLA DS was considering HVF for award, as opposed to DLA DS' treatment of Lamb

when subsequently considering Lamb for award, which occurred after HVF was eliminated from competition. For instance, protestor argues that DLA DS acted unreasonably when it: (1) "extrapolated from the test results of samples taken at HVF's facility to find a 'probable' violation, but concluded there was no issue as to substantially similar test results of samples taken at Lamb's facility," (2) "assumed that HVF would not remove tires before the requested deadline, but then assumed that Lamb would receive all requisite permits before performance," and (3) "labeled HVF as uncooperative for not allowing the agency to take photographs, but declined to criticize Lamb for managing the photographs of its facility." (capitalization and emphasis omitted). Certainly, fair treatment of all competitors in the procurement process is the applicable standard and requirement. The court, however, finds protestor's string of arguments related to the alleged disparate treatment between HVF and Lamb insufficient. DLA DS had not begun to consider Lamb for award until after DLA DS had eliminated HVF from competition.

Pursuant to the bridge contract solicitation, only one competitor was to be evaluated at a time, starting with the apparent high bidder. The Solicitation also stated that "[o]nly the high bidder will be evaluated through this screening process and there will be no comparative analysis done on other bidders." Only in the event that DLA DS found the apparent high bidder to be non-responsible would DLA DS move on to consider the next highest bidder. A determination of whether HVF was sufficiently environmentally responsible to be awarded the contract was a direct result of the unique conditions presented at the HVF's proposed site for contract performance. Even if DLA DS made mistakes in how it reviewed and evaluated the Lamb site, HVF still had to establish that the agency's actions resulting in DLA DS eliminating HVF from competition at the time that it did, were arbitrary and capricious. As discussed above, DLA DS was reasonable, not arbitrary and capricious, when the agency eliminated HVF for award based on the concerns borne from the adverse hazardous and solid waste conditions identified by DLA DS and ADEQ inspectors at HVF's site proposed for contract performance. Protestor cannot establish that it was prejudiced by DLA DS' treatment of Lamb, including any difference in the alleged treatment between the two competitors in this bid protest; HVF was eliminated on its own record. As discussed above, to prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."); IT Enter. Sols. JV, LLC v. United States, 132 Fed. Cl. at 173 (citing Bannum v. United States, 404 F.3d at 1357-58); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 694-96.

The court cannot find, based on the record before the court, that DLA DS acted unreasonably. Moreover, protestor specifically indicated that it was not protesting the award to Lamb. The concerns raised by DLA DS and ADEQ when inspecting HVF were not present in DLA DS' and ADEQ's inspections of Lamb's proposed site for contract performance. Indeed, Lamb's proposed site had been in operation for less than one year at the time of DLA DS' consideration of Lamb for award, and there appeared to be less

accumulation of property, raising less concern. Moreover, unlike during ADEQ's hazardous waste inspection of HVF, in which ADEQ identified green paint indicative of potentially high levels of cadmium and chromium, the record before the court indicates that ADEQ's inspection of Lamb did not identify green paint, and therefore, ADEQ was not prompted to collect and test soil samples at Lamb's proposed site for contract performance. Furthermore, the ADEQ inspections of Lamb did not result in the issuance of any actual citations to Lamb, nor did ADEQ require Lamb to conduct any corrective action. Also, no ADEQ or DLA DS inspectors documented occurrences of Lamb employees being reluctant to provide information with regard to Lamb's site, and it appears that Lamb's limitations on the photographs taken at its site did not combine with occurrences of lack of forthright interactions to raise a red flag for DLA DS. Finally, with regard to the permits that Lamb had not yet received, which included permits from the Pima County Fire Marshall to operate a plasma cutter, a secure gate, and mobile trailers, the Pima County Fire Marshall, Willie Treach, stated in a call to Tim Cronk of DLA DS that he had "no concern about their [Lamb's] operations. As I stated earlier, they are working with me regarding the permits they need. They have already requested multiple permits and I am working through those requests. I have no issue with [them selling] scrap material." Based on the record before the court, the totality of adverse circumstances did not appear to be present for Lamb as they were for HVF.

## CONCLUSION

Therefore, the court **DENIES** defendant's and defendant-intervenor's motions to dismiss for lack of jurisdiction and lack of standing, **DENIES** protestor's motion for judgment on the administrative record, and **GRANTS** defendant's and defendant-intervenor's motions for judgment on the administrative record regarding the bridge contract at issue in the case before the court. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED.**

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
**Judge**